**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| MICHAEL T. PARKER | * |
| and | |
| PATRICE PARKER | * |
| | Case No. 8:20-cv-03581-ADC |
| Plaintiffs, | * |
| v. | |
| | * |
| GOLDMAN SACHS MORTGAGE | |
| COMPANY LIMITED PARTNERSHIP, *et al.*, | * |
| | |
| Defendants. | * |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT AND TO STRIKE CLASS ALLEGATIONS**

Dated:  February 5, 2024

Respectfully submitted,

*/s/ Melissa O. Martinez*
Melissa O. Martinez (Federal Bar No. 28975)
Nicholas B. Jordan (Federal Bar No. 22067)
**MCGUIREWOODS LLP**
500 East Pratt Street, Suite 1000
Baltimore, MD 21202-3169
(410) 659-4432
(410) 659-4482 Fax
mmartinez@mcguirewoods.com
njordan@mcguirewoods.com

Brian E. Pumphrey (admitted *pro hac vice*)
**MCGUIREWOODS LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-7745
(804) 698-2018 Fax
bpumphrey@mcguirewoods.com

*Counsel for Goldman Sachs Mortgage Company*
*Limited Partnership and NewRez LLC d/b/a*
*Shellpoint Mortgage Servicing*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ....................................................................... 2

I.     Plaintiffs Required Multiple Loan Modifications From Their Prior Servicers And
       Had Accumulated 20 Months' Worth Of Late Fees By The Time Shellpoint
       Began Servicing Their Loan In October 2019. ....................................................... 2

II.    Plaintiffs' Loan Was In Loss Mitigation When Shellpoint Began Servicing, Thus
       Requiring Property Valuation. ................................................................................. 4

III.   Plaintiffs Were Not Charged, And They Never Paid, For The BPO. ....................... 5

IV.    The OCFR's 2017 Examination Led To Shellpoint's Remediation And Refund Of
       Visual Property Inspection Fees Charged To Borrowers And Cessation Of That
       Practice. ................................................................................................................. 6

BRIEF PROCEDURAL HISTORY ................................................................................... 8

STANDARD OF REVIEW ............................................................................................... 8

ARGUMENT ................................................................................................................... 9

I.     THE COURT SHOULD GRANT SUMMARY JUDGMENT TO
       DEFENDANTS ON COUNT I BECAUSE PROPERTY VALUATION FEES
       ARE NOT PROHIBITED BY THE USURY STATUTE. ........................................... 9

       A.     The Plain Language And Legislative History Of The Usury Statute
              Establish That Inspection Fees Relate To Visual Inspections Only, Not
              Property Valuations. ...................................................................................... 10

       B.     State And Federal Regulators Similarly Interpret "Inspection Fee" As
              Relating To Visual Property Inspections In Connection With Property
              Preservation, Not Property Valuation. ............................................................ 15

              1.     In Maryland, property inspections are part of property preservation
                     following default. .................................................................................. 16

              2.     Property valuation has nothing to do with property preservation. ........... 18

       C.     Defendants, And The Rest Of The Mortgage Industry, Differentiate
              Between Visual Property Inspections And Property Valuations. ...................... 20

              1.     Property inspections do not require specialized training or
                     qualifications and entail nothing more than viewing properties. .............. 20

              2.     BPOs are done by trained and licensed real estate brokers and
                     therefore cost significantly more than property inspections. .................... 21

**TABLE OF CONTENTS**
(continued)

**Page**

II.      THE COURT SHOULD GRANT SUMMARY JUDGMENT TO
         DEFENDANTS ON COUNTS II AND III BECAUSE THERE ARE NO
         MCDCA AND MCPA VIOLATIONS WITHOUT AN UNDERLYING
         VIOLATION OF THE USURY STATUTE. ................................................................... 25

III.     THE COURT SHOULD GRANT SUMMARY JUDGMENT TO
         DEFENDANTS ON PLAINTIFFS' CLAIM FOR DAMAGES.................................... 27

IV.      THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS BECAUSE
         PLAINTIFFS ARE NOT MEMBERS OF THE CLASS THEY SEEK TO
         REPRESENT. ............................................................................................................. 28

CONCLUSION............................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*1501 P'ship v. County of Hennepin*,
   No. 22-CV-11-10280, 2015 WL 820849 (Minn. Tax Ct. 2015)..............................................14

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970)..............................................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................................9

*Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*,
   822 F. Supp. 2d 505 (D. Md. 2011) ...................................................................................27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................................8

*Friendly Finance Corp. v. Orbit Chrysler Plymouth Dodge Truck, Inc.*,
   373 Md. 337 (2003) ............................................................................................................15

*Graves v. State*,
   364 Md. 329 (2001) ............................................................................................................12

*Herron v. Mayor and City Council of Annapolis, Md.*,
   388 F. Supp. 2d 565 (D. Md. 2005) ...................................................................................29

*Howes v. Wells Fargo Bank, N.A.*,
   No. ELH-14-2814, 2015 WL 5836924 (D. Md. Sept. 30, 2015)........................................12

*Iko v. Shreve*,
   535 F.3d 225 (4th Cir. 2008) ...............................................................................................9

*Lienhart v. Dryvit Sys., Inc.*,
   255 F.3d 138 (4th Cir. 2001) .............................................................................................29

*Lockshin v. Semsker*,
   412 Md. 257 (2010) .....................................................................................................12, 13

*Morgan v. Caliber Home Loans, Inc.*,
   No. 8:19-CV-02797-PX, 2022 WL 16964705 (D. Md. Nov. 16, 2022)................................9

*Nationstar Mortgage LLC v. Kemp*,
   476 Md. 149 (2021) .....................................................................................................11, 12

*Parker v. Goldman Sachs Mortgage Co. Ltd. Pship.*,
  596 F. Supp. 3d 559 (D. Md. 2022) ..................................................................8, 27

*Pelino v. Ward Mfg., LLC*,
  No. 14-cv-02771-RDB, 2015 WL 4528141 (D. Md. July 25, 2015) .....................30

*Pollin v. Community Mgmt. Corp.*,
  No. GLR-22-1700, 2023 WL 6067119 (D. Md. Sept. 18, 2023) ..........................26

*Prowse v. Nwankwo*,
  No. 14-1270 (SDW), 2014 WL 1767590 (D.N.J. May 2, 2014) ...........................14

*Robinson v. Nationstar Mortgage LLC*,
  No. CV TDC-14-3667, 2019 WL 4261696 (D. Md. Sept. 9, 2019) ....................9, 30

*Scott v. Harris*,
  550 U.S. 372 (2007)................................................................................................9

*Statin v. Deutsche Bank Nat'l Tr. Co.*,
  598 F. App'x 322 (5th Cir. 2015) ........................................................................14

*Stewart v. Bierman*,
  859 F. Supp. 2d 754 (D. Md. 2012) .....................................................................27

*Taylor v. Friedman*,
  344 Md. 572 (1997) .........................................................................................11, 12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..............................................................................................30

*Whiting-Turner Contracting Co. v. Fitzpatrick*,
  366 Md. 295 (2001) ..............................................................................................11

STATUTES

15 U.S.C. § 1692e ......................................................................................................26

Md. Code, Com. Law § 12-121 ............................................................................ *passim*

Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692–1692p .............26, 27

Maryland Consumer Debt Collection Act (MCDCA),
  Md. Code, Com. Law § 14-201 *et seq.* ................................................25, 26, 27, 28

Maryland Consumer Protection Act (MCPA)
  Md. Code, Com. Law § 13-301 *et seq.* ................................................25, 26, 27, 28

Md. Code, Bus. Occ. & Prof. § 16-101.....................................................................15

Md. Code, Bus. Occ. & Prof. § 17-301.................................................................................23

**OTHER AUTHORITIES**

12 C.F.R. § 1026.41 .................................................................................................5, 6

CFPB Examination Procedures.............................................................................17, 19

7A Charles Alan Wright & Arthur R. Miller,
    Fed. Prac. & Proc. Civ. § 1761 (3d ed.), § 1761 ...............................................9, 28

Fannie Mae Property Inspection Report ......................................................................18

Fannie Mae Selling Guide .....................................................................................19, 21

Fannie Mae Servicing Guide ......................................................................................17

Fed. R. Civ. P. 23 .............................................................................................9, 28, 29

Fed. R. Civ. P. 56 .....................................................................................................8, 9

## <u>INTRODUCTION</u>

Property inspections are common in the mortgage industry.  Investors like Goldman Sachs and the Federal National Mortgage Association ("Fannie Mae") require property inspections when borrowers default to ensure that properties securing their loans do not fall into disrepair.  Property valuations are also common.  Investors use property valuations for a variety of purposes, from determining the terms of a mortgage, to determining a borrower's eligibility for payment assistance or loan modification.  Property inspections are not the same as property valuations.

The clear and unambiguous distinction between property inspections and property valuation is dispositive of this entire case.  The pure legal question before the Court is whether the Maryland Usury Statute's prohibition on charging inspection fees to borrowers also prohibits the imposition of fees for valuations of real property in the form of a broker price opinion ("BPO").  The answer is no.  This answer is based on the unambiguous plain language of the statute, the legislative history of the statute, the guidance of state and federal regulatory agencies, the significant practical differences between inspections and valuation, and the difference in the mortgage industry's understanding and use of inspections and valuations.

This one legal issue is also determinative of whether a class survives.  Plaintiffs seek to represent a class of borrowers that were charged property inspection fees.  But the one fee that Plaintiffs complain about was not an inspection fee.  It was a BPO ordered by Shellpoint because the prior servicer identified Plaintiffs' loan as being in active loss mitigation status.  In any event, Plaintiffs were not actually charged for the BPO.  And they did ***not*** pay it.  Instead, the investor on their loan, Defendant Goldman Sachs, paid it.  And because Shellpoint *never* charged an inspection fee to Plaintiffs, they cannot represent any class of borrowers who were so charged.

For the reasons set forth below, Defendants respectfully request that the Court enter summary judgment in their favor and strike the class allegations.

1

## STATEMENT OF UNDISPUTED FACTS

I.     **Plaintiffs Required Multiple Loan Modifications From Their Prior Servicers And Had Accumulated 20 Months' Worth Of Late Fees By The Time Shellpoint Began Servicing Their Loan In October 2019.**

On December 17, 1993, Plaintiffs purchased the property at 6714 Berkshire Drive, Temple Hills, Maryland 20748 (the "Property") by taking out a VA loan in the amount of $145,900.  Apx. 432.[1]  On April 25, 2001, a foreclosure action was filed against Plaintiffs in the Circuit Court for Prince George's County, which was later dismissed.  Case No. CAE01-08971.  On December 7, 2005, Plaintiffs refinanced the purchase of their Property with a loan in the amount of $193,482 ("Note") with Homecomings Financial Network, Inc.  Apx. 436.  The Note was secured by a Deed of Trust recorded against the Property.  Apx. 440.  Plaintiffs defaulted on the Note a number of times, requiring multiple loan modifications.[2]

On September 21, 2019, Plaintiffs' prior servicer, Mr. Cooper, created a "case" identifying Plaintiffs' loan for loss mitigation.  Apx. 493, Tr. 70:1-5 ("[C]ase create date would be -- so if we were looking at the borrowers for any loss mitigation assistance, basically, it creates a case in the system for us to keep information about any loss mitigation efforts.").  On September 25, 2019, Mr. Cooper sent Plaintiffs a Loan Modification Packet in response to their "request for payment assistance."  Apx. 496.[3]

---

[1] Shellpoint has attached all exhibits in Appendix format so that both parties may be use the same citations in their briefing.

[2] On December 9, 2009, Plaintiffs executed a loan modification for their mortgage, which set forth a new principal loan balance of $193,336.55.  Apx. 459-46).  On April 16, 2015, a second foreclosure action was filed against Plaintiffs in the Circuit Court for Prince George's County, which was later dismissed.  Case No. CAEF15-08632. On April 14, 2016, Plaintiffs executed a second loan modification, setting their new principal loan balance at $197,535.72.  Apx. 466-473.  On January 18, 2018, a third foreclosure action was filed against Plaintiffs in the Circuit Court for Prince George's County, which was later dismissed.  Case No. CAEF18-00887.

[3] Plaintiffs also produced this document at Parker101723-000001657.

Mr. Cooper serviced Plaintiffs' loan until October 4, 2019, when servicing transferred to Shellpoint.  Apx. 499.  By this time, Plaintiffs had accumulated twenty (20) months of late fees with Mr. Cooper[4] totaling $952.60:

| Trans Date | Eff Date | Due Date | Trans Desc | Rev Code | Flag | Trans Amount | Principal Amount | Balance | Interest Amount | Escrow Amount | Balance | Late Charge Amount | Balance | Unappl Balance | Money Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/10/19 | 10/10/19 | 10/01/19 | New Loan | 0 | 0 | $0.00 | | $191,761.33 | | | $165.93 | $165.93 | $0.00 | $952.60 | $0.00 | None |

Apx. 513-518; Apx. 562, Tr. 95:9 ("I owed late charges, right.").  This information was transmitted to Shellpoint.  Apx. 30, Tr. 73:5-6 ("And from my review of the payment history, the 952.60 is the late charges.").

Because Mr. Cooper did not have sufficient time to evaluate Plaintiffs for a loan modification between September 25, 2019 and October 4, 2019, any loan modification was required to be completed by Shellpoint.  Apx. 578-579 ("Please note that you will need to continue the modification process with the new servicer.").  Mr. Cooper could not "comment on the new servicer's policies and practices" but, as is regular practice in the industry, any loan modification required a "Brokers Price Opinion (BPO) [which] is used to estimate the value of a real estate property."  Apx. 579.

When servicing transferred from Mr. Cooper to Shellpoint, Mr. Cooper's documents indicated that Plaintiffs' loan was in active loss mitigation status.  Apx. 31, Tr. 77:7-11 ("From reviewing history prior to what's supplied, it appeared that the borrowers had requested loss mit from their prior servicer, and then the loan transferred to us in that status, which would have triggered loss mit activity."); Apx. 496.

---

[4] Plaintiffs' loan modification in 2016 zeroed out the late charges and Plaintiffs' trial payments were applied to the loan on August 8, 2016.  *Id*. at 7-8.  By January 2017, however, Plaintiffs fell one month behind on their monthly mortgage payments and began to accrue late charges.  *Id*. at 7.  For example, they made a payment on February 28, 2017, which was applied to their January 1, 2017 payment.  *Id*.  The late charge balance continued to increase over time.  *Id*. at 2-7.  All of this occurred before Shellpoint began servicing Plaintiffs' loan in October 2019.

## II.   Plaintiffs' Loan Was In Loss Mitigation When Shellpoint Began Servicing, Thus Requiring Property Valuation.

At the time of servicing transfer, Shellpoint required initial property valuations to evaluate a borrower for a loan modification, also known as loss mitigation in the servicing industry:

> **When to order a valuation**
> An initial valuation shall be ordered when a loan becomes 60 days past due.  A valuation that is newer than 90 days old is required in the following circumstances unless otherwise directed by the investor:
>
> - ***To evaluate value for a loss mitigation decision***;
> - To evaluate value for a foreclosure decision (i.e. bid at sale, complete foreclosure, redeem property);
> - To evaluate REO fair-market-value (FMV);
> - Reconciliation values are ordered to reconcile the large variances between recent values.

Apx. 41 (emphasis added).  Shellpoint uses different types of property valuations, including broker price opinions ("BPO"), interior BPOs, full appraisal, drive-by appraisal, automated valuation model ("AVM"), and reconciled and adjusted market price.  Apx. 40-41.  Shellpoint defines BPOs as:

> A Broker Price Opinion (BPO), also known as a Comparative Market Analysis (CMA), is a valuation analysis typically completed by a real estate agent or broker. An Exterior BPO consists of an exterior inspection and a determination of market value based on comparisons to similar properties in close proximity that have recently sold or are currently listed for sale. Typically, an exterior BPO is utilized when we do not have access to complete an interior inspection. Certain states have restrictions on the use of Broker Price Opinions.

Apx. 40.

Because Plaintiffs' loan was coded as being in active loss mitigation at servicing transfer, Shellpoint ordered a property valuation in the form of a BPO.  Apx. 40; Apx. 584; Apx. 602-603.

On October 29, 2019, Maryland-licensed real estate broker Antoine B. Johnson prepared a BPO on the Property.  Apx. 622-623.  Mr. Johnson first visited the Property and took pictures of its exterior, as well as the neighboring homes, to determine the condition of the Property vis-à-vis

the other homes in the neighborhood.  Apx. 626-630.  He then performed a comparative sale analysis of three other similar properties in Temple Hills, Maryland that sold within the last few months.  Apx. 623.  Mr. Johnson also reviewed the available listings of three other similar properties in Temple Hills, Maryland.  Apx. 624.  For both analyses, Mr. Johnson analyzed the comparable properties, the available inventory of properties, and the market trends in the area.  Apx. 622.  Based on all of this information, Mr. Johnson set forth his opinion on the as-is and as-repaired price that Plaintiffs' property would fetch on the market.  Apx. 625.

**III.    Plaintiffs Were Not Charged, And They Never Paid, For The BPO.**

As of October 23, 2019, Plaintiffs had a $952.60 balance for late charges on their loan. Apx. 513.  Plaintiffs' late charge balance had steadily increased over time.  Apx. 513-518.

A BPO charge of $105 was added to the loan on November 8, 2019, after the BPO was completed.  Apx. 513.  On the same day, however, a "payment" of the same exact amount of $105 was made on Plaintiffs' loan.  *Id.*  The "Transaction Activity" section[5] of Plaintiffs' November 13, 2019 monthly mortgage statement sets forth these two transactions dated November 8, 2019:

| **Transaction Activity (10/19/2019 - 11/12/2019)** | | | |
| --- | --- | --- | --- |
| **Date** | **Description** | **Charges** | **Payments** |
| 10/23/2019 | Regular Payment - (Due 10/1/2019) | $0.00 | $1,437.11 |
| 11/08/2019 | BPO/Aprsl Cost Disbursement | $105.00 | $0.00 |
| 11/08/2019 | BPO/Aprsl Cost Payment | $0.00 | $105.00 |
| 11/12/2019 | Regular Payment - (Due 11/1/2019) | $0.00 | $1,437.11 |

Apx. 637.

---

[5] Regulation Z requires mortgage servicers to provide all borrowers with a "list of all transaction activity that occurred since the last statement. . . . ***transaction activity*** means any activity that causes a credit or debit to the amount currently due.  This list must include the date of the transaction, a brief description of the transaction, and the amount of the transaction for each activity on the list."  12 C.F.R. § 1026.41(d)(4) (emphasis added); *see also* Apx. 652, Tr. 42:6-11 ("So those are charges and then payments.  So, Payments would be – for the purposes of this statement, you could think of these as debits and credits.  Right?  The payments, we see the payments from the mortgagee.  There was a $105 charge for the BPO, and then the $105 charge was backed out.").

In the "Explanation of Amount Due" section[6] of the same mortgage statement, the $105 charge appears in the "Total Fees and Charges" line.  *Id*.  The "Overdue Payment" line shows $847.60, which represents the $952.60 late balance on the late charges minus the $105 reversal:

| Explanation of Amount Due | |
|---|---|
| Principal | $154.79 |
| Interest | $797.72 |
| Escrow (Taxes and Insurance) | $484.60 |
| **Regular Monthly Payment** | **$1,437.11** |
| Total Fees and Charges | $105.00 |
| Overdue Payment | $847.60 |
| **Total Amount Due** | **$2,389.71** |

*Id*.  In other words, the charge and reversal cancelled each other out.  And while a $105 charge appears under "Explanation of Amount Due," the $105 "Payment" decreased the Overdue payment by the same amount, showing that Plaintiffs were not actually charged for the BPO.  Apx. 7, ¶ 37.

Plaintiffs never paid for the BPO.  *Id.* ¶ 35.  Instead, the BPO fee was reclassified as third-party recoverable so that it was charged to and paid by the investor on the loan, Goldman Sachs. *Id.*  Servicing of Plaintiffs' loan transferred from Shellpoint to Select Portfolio Servicing, Inc. effective March 1, 2021.  Apx. 659.  At no point during the time that Shellpoint serviced the loan did Shellpoint impose an inspection fee on the account.  Apx. 7, ¶ 38.

## IV. The OCFR's 2017 Examination Led To Shellpoint's Remediation And Refund Of Visual Property Inspection Fees Charged To Borrowers And Cessation Of That Practice.

In 2017, the Maryland Office of the Commissioner of Financial Regulation ("OCFR") conducted an examination of Shellpoint's mortgage servicing practices in Maryland.  Apx. 52-67. In December 2017, the OCFR completed this examination.  Apx. 54.  The OCFR informed

---

[6] Regulation Z also requires mortgage servicers to provide borrowers the "total sum of any fees or charges imposed since the last statement" owed by a borrower in a separate portion of their mortgage statements—the Explanation of Amount Due section.  12 C.F.R. § 1026.41(d)(2)(ii).

Shellpoint that charging visual inspection fees to borrowers was prohibited by the Usury Statute. Apx. 63. Accordingly, Shellpoint ceased doing so and refunded all charges to borrowers. Apx. 69. On May 11, 2018, Shellpoint implemented a systematic but manual control within its invoice processing system that was intended to prevent inspection fees from being charged to Maryland borrowers by moving such fees to a third-party recoverable fee category (*i.e.*, charging the mortgagee/investor instead of the borrower). Apx. 73, ¶ 5. In the summer and early fall of 2018, Shellpoint worked with the developers of their systems of record, LoanSphere and Servicing Director, to implement an automated technical control of coding visual inspection fees so that the reclassification that was being done manually could become wholly automated. Apx. 8, ¶ 44. In September 2018, Shellpoint began to implement this automated process. *Id*. ¶ 45. These processes were part of Shellpoint's efforts to comply with the expectations of the OCFR and the terms of its Memorandum of Understanding ("MOU") with the OCFR, which was executed on August 6, 2018. Apx. 72-74. On December 14, 2018, Shellpoint finalized the wholly automated reclassification process. Apx. 9, ¶ 47. Shellpoint has not assessed an inspection fee to a borrower in Maryland since January 1, 2019. *Id.* Plaintiffs did not become Shellpoint customers until October 2019. Apx. 5, ¶ 22; Apx. 499.

Throughout the examination process and the execution of the MOU, the OCFR never once mentioned property valuations in general, or broker price opinions ("BPOs") specifically, as being prohibited by the Usury Statute. Apx. 52-67; Apx. 72-74. In fact, OCFR representative Clifford Charland testified that the OCFR has never issued any opinions on BPOs. Apx. 681, Tr. 78:20-79:1.

## BRIEF PROCEDURAL HISTORY

Plaintiffs filed this putative class action in the Circuit Court for Montgomery County on October 30, 2020 (the "Complaint"). ECF 1. Defendants timely removed the case to this Court on December 10, 2020. *Id*. On December 31, 2020, Plaintiffs filed an Amended Class Action Complaint that eliminated any claims relating to convenience fees and focused Plaintiffs' allegations on inspection fees that they claim were illegally charged to Plaintiffs and a class of borrowers under the Usury Statute. ECF 7. Defendants moved to dismiss the Amended Class Action Complaint, which the Court granted in part and denied in part on March 31, 2022. *Parker v. Goldman Sachs Mortgage Co. Ltd. Pship*., 596 F. Supp. 3d 559, 572 (D. Md. 2022). Defendants answered on May 6, 2022. ECF 31. The parties have completed fact discovery. *See* ECF 59. Defendants now move for summary judgment and to strike the class allegations because there is one legal issue that will end the case in its entirety and eliminate Plaintiffs as class representatives.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his

pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).

Under Rule 23(a), a potential class plaintiff must show that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(3)-(4). Class treatment is appropriate only where "the named representative party is a member of the class that party purports to represent."  7A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1761 (3d ed.), § 1761; *see also Robinson v. Nationstar Mortgage LLC*, No. CV TDC-14-3667, 2019 WL 4261696, at *15 (D. Md. Sept. 9, 2019) ("[N]amed class representatives [must] demonstrate standing through a 'requisite case or controversy between themselves personally and defendants,' not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (quoting *Cent. Wesleyan Coll. V. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993)) (alterations in original).  "'If class treatment on the face of the complaint leaves little doubt that a class action is not viable,' the court should strike the class allegations."  *Morgan v. Caliber Home Loans, Inc.*, No. 8:19-CV-02797-PX, 2022 WL 16964705, at *2 (D. Md. Nov. 16, 2022) (quoting *Richards v. NewRez LLC*, No. ELH-20-1282, 2021 WL 1060286, at *29 (D. Md. Mar. 18, 2021)).

## ARGUMENT

I. **THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS ON COUNT I BECAUSE PROPERTY VALUATION FEES ARE NOT PROHIBITED BY THE USURY STATUTE.**

The only fee imposed on Plaintiffs by Shellpoint that is at issue is a BPO—a valuation tool regularly used by mortgage servicers to determine terms of loan modifications.  Plaintiffs claim that any fee for any activity where a servicer inspects a property is automatically prohibited by the Usury Statute.  This is wrong.  The plain language of the Usury Statute, as confirmed by the

legislative history, establishes that an "inspection fee" is a fee charged in connection with a visual inspection of a property at loan settlement or for property preservation purposes, and has nothing to do with property valuation or loan modifications.  State and federal regulatory agencies have interpreted "inspection fee" in this same way.

### A. The Plain Language And Legislative History Of The Usury Statute Establish That Inspection Fees Relate To Visual Inspections Only, Not Property Valuations.

In relevant part, the Usury Statute states:

(a) "Lender's inspection fee" defined. – In this section, the term "lender's inspection fee" means a fee imposed by a lender to pay for a visual inspection of real property.

(b) Imposition. – Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.

(c) When permitted -- A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:
  (1) Construction of a new home; or
  (2) Repairs, alterations, or other work required by the lender.

(d) Applicability of section to appraisal -- This section does not apply to an appraisal of the value of real property by a lender or to fees imposed in connection with an appraisal.

Md. Code. Com. Law ("CL") § 12-121.

A "lender's inspection fee" is "a fee imposed by a lender to pay for a visual inspection of real property." CL § 12-121(a).  This language is unambiguous.  CL § 12-121 addresses only one activity—a visual inspection of property, *i.e.*, someone looking at a property.  The statute does not address every other activity that may involve looking at a property but entails other acts (of which there are many in the servicing industry).

This plain language is supported by the legislative history. *See Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 301 (2001) ("The paramount object of statutory construction is the ascertainment and effectuation of the real intention of the Legislature.").  As explained in *Nationstar Mortgage LLC v. Kemp*, 476 Md. 149, 170 (2021), CL § 12-121 was added

in 1986 based on Recommendation No. 7 of a Special Task Force.   Recommendation No. 7 explains:

> A cost frequently levied at settlement by the lender is an inspection fee.  Such a fee is appropriate for loans on new construction or for re-sale properties where the lender has reason to confirm completion of required repairs or alterations before a loan can be made.   However, some lender inspection fees are charged to the borrower when inspections are not needed or required.   This unnecessary fee adds as much as $100 to the cost of closing a loan for a so-called "windshield" or "drive-by" inspection.

> The Task Force recommends prohibition of this fee by lenders unless the lender is at risk because an inspection is needed to confirm completion of repairs, alterations, or new construction.

Apx. 719.

In *Taylor v. Friedman*, 344 Md. 572, 584 (1997), the Maryland Supreme Court held that the CL § 12-121's prohibition on charging an inspection fee to a borrower includes visual inspections at settlement, as well as visual inspections in the context of property preservation following a borrower's default.  The borrower in *Taylor* became delinquent and the lender engaged a third-party company to visually inspect the property on a monthly basis, charging the borrower $10 for each inspection.  *Id*. at 575.  The lender conducted the visual inspections in compliance with the Department of Housing and Urban Development's (HUD) requirements that, following 45 days of default, "the mortgagee shall make a visual inspection of the property to determine ***occupancy status***."  *Id*. at 576 (emphasis added).  The Court then ruled that such charges could not be assessed to the borrower.  *Id*. at 584.

Years later, the Maryland Supreme Court in *Kemp* dealt with drive-by inspections of the property of a borrower who defaulted on her mortgage.  476 Md. at 153.  These charges were classified as "property preservation charges" because they relate to the lender's inspection of property "***to verify that the property is occupied and in good repair***."  *Id*. at 164 (emphasis added).

The Court then held that CL § 12-121's prohibition against a "lender" imposing inspection fees to a borrower also applies to the lender's assignees.  *Id*. at 187-88.

In other words, CL § 12-121 applies to simple visual property inspections when a loan originally closes, or to determine occupancy status and general condition following default.

In contrast, the plain language of the Usury Statute and its legislative history do not mention BPOs or broker price opinions.   It is a cardinal rule of statutory interpretation that courts cannot read words into a statute that are not there.  *See Lockshin v. Semsker*, 412 Md. 257, 275 (2010) (quoting *Lonaconing Trap Club, Inc. v. Dep't of Env't,* 410 Md. 326, 339 (2009)) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with 'forced or subtle interpretations' that limit or extend its application."); *Graves v. State*, 364 Md. 329, 351 (2001) (A court may "'not invade the function of the legislature' by reading missing language into a statute").

The only opinion examining whether a BPO is prohibited under CL § 12-121 is *Howes v. Wells Fargo Bank, N.A.*, No. ELH-14-2814, 2015 WL 5836924, at *42 (D. Md. Sept. 30, 2015), in which Judge Hollander affirmed the bankruptcy court's dismissal of a claim that an "Appraisal/broker's price opinion fee" constituted a violation of a similar provision in the Commercial Law Article applicable to closed end credit.   The plaintiffs claimed that fees associated with a BPO conducted on their property violated CL § 12-1027, which has the exact same wording as CL § 12-121.   *Id*.  Judge Hollander explained that the plaintiffs had "failed to provide any facts to support the notion that the contested fees listed on the 'Statement of Prepetition Fees, Expenses, and Charges' as appraisal fees were actually inspection fees precluded by C.L. § 12–1027."  *Id*.   In short, Judge Hollander followed basic tenets of statutory construction in refusing to read words into the statute to cover fees not expressly identified.

Plaintiffs will likely try to argue that CL § 12-121 identifies only two types of mortgage servicing activities—an inspection and an appraisal—so if a BPO is not an appraisal, then it must be an inspection, and therefore Defendants were prohibited from passing fees associated with it to the borrower. This argument is flawed for a number of reasons. ***First***, there is no indication in the statute or its legislative history that the General Assembly sought to categorize all servicing activities that involve viewing a property into these two binary categories. *See Lockshin v. Semsker*, 412 Md. 257, 275 (2010) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with 'forced or subtle interpretations' that limit or extend its application.") (citation omitted). Indeed, ***all*** property preservation activities include visual inspections of property, in addition to doing necessary maintenance work like cutting grass and picking up trash (which are not addressed by the statute either). Apx. 4, ¶ 20. In order to prepare a valuation, such as a BPO or even an appraisal, a visual inspection of the exterior of the property is required. *Id.* ¶ 4. There is no evidence, nor is there any logical support, for the proposition that the General Assembly intended to ban BPO fees by excepting appraisal fees from the ambit of a ban on inspection fees. Put another way, that the General Assembly went out of its way to ensure that appraisal fees would remain legal cannot lead to the conclusion that it intended to ban BPO fees when the term "BPO" appears nowhere in the Usury Statute.

***Second***, there is no reason to exclude BPOs from the undefined term "appraisals" or from the phrase "fees imposed in connection with an appraisal" in CL § 12-121. Courts nationwide routinely use BPOs to assess property value. *See, e.g., Statin v. Deutsche Bank Nat'l Tr. Co.*, 598 F. App'x 322, 322–23 (5th Cir. 2015); *Prowse v. Nwankwo*, No. 14-1270 (SDW), 2014 WL 1767590, at *2 (D.N.J. May 2, 2014) (approving of the bankruptcy's court's reliance upon a

comparative market analysis even though it was not a formal appraisal under USPAP because "it

is sufficiently substantiated").   Confronted with the issue of whether a BPO could be considered

an appraisal (which was not defined in the relevant statute), a Minnesota tax court answered in the

affirmative, explaining:

> The statute at issue in this case is unambiguous. Merriam–Webster defines "appraisal" as "something that states an opinion about the value, condition, or importance of something." The Uniform Standards of Professional Appraisal Practice (USPAP) defines "appraisal" as "the act or process of developing an opinion of value; an opinion of value." Black's Law Dictionary defines appraisal as:
>
> 1. The determination of what constitutes a fair price for something or how its condition can be fairly stated; the act of assessing the worth, value, or condition of something.
> 2. The report of such a determination; specif., a statement or opinion judging the worth, value, or condition of something. (emphasis added).
>
> Applying the plain meaning of the word appraisal, it is clear that the broker's report is an appraisal.  The report analyzes the property as of January 2, 2010 under both the market and income approaches to value, reconciles the approaches, and states an opinion of value.

*1501 P'ship v. County of Hennepin*, No. 22-CV-11-10280, 2015 WL 820849, at *2 (Minn. Tax Ct.

2015).  This analysis is instructive.  The plain meaning of "appraisal" subsumes BPOs and "fees

in connection with an appraisal" includes fees for a BPO.

In response, Plaintiffs will likely argue that "appraisal" is *not* undefined.  They will contend

that:  (1) "appraisal" already has a definition in a separate Article of the Maryland Code (the

Business Occupations and Professions Article ("BOP")); (2) that definition requires that an

appraisal be performed by a licensed real estate appraiser in order to be considered an appraisal

(BOP § 16-101(b);§ 16-301(a)); and (3) that the BOP Article definition of appraisal applies to the

Commercial Law Article.  In other words, "appraisal" fees as referred to in CL § 12-121(d), which

are excepted from the Usury Statute's prohibition on inspection fees, does not include BPO fees

because BPOs are not performed by a licensed Maryland appraiser, and therefore BPO fees are prohibited by the statute.  This contention fails for two reasons.

First, Maryland courts have previously declined to impose a restrictive definition in one section of the Maryland Code into another when the provisions are unrelated.  The Maryland Supreme Court explained:

> We previously have declined to import the definition of the word "owner" from one article of the Maryland Code to another.  When construing § 16–203 in *Central GMC, Inc. v. Helms*, 303 Md. 266, 272 (1985), we found that the definition of "owner" in Maryland Code (1977), § 11–143 of the Transportation Article was not applicable because "§ 11-101 [of the] Transportation Article, relative to definitions, states, 'In the Maryland Vehicle Law, the following words have the meanings indicated, unless the context requires otherwise.'  This controversy does not involve 'Maryland Vehicle Law' which embraces Titles 11–27, Transportation Article.

*Friendly Finance Corp. v. Orbit Chrysler Plymouth Dodge Truck, Inc*., 373 Md. 337, 352 n.25 (2003).  Similarly, here, the General Assembly did not give any indication that a specialized definition in the BOP Article—which focuses on professional licensure—should be imported into the Usury Statute in the CL Article when the Usury Statute does not involve licensure of appraisers.

Second, this argument relies on two incorrect premises: (1) that there are only two categories of mortgage servicing activities – appraisals and inspections; and (2) if the servicing activity does not qualify as an appraisal, then it must be an inspection.  As previously stated, there is no evidence that this was the legislature's intent for CL § 12-121.  *See supra* Section I.A at 13.  Even if a BPO is not an appraisal, it does not automatically make it an inspection.

**B.      State And Federal Regulators Similarly Interpret "Inspection Fee" As Relating To Visual Property Inspections In Connection With Property Preservation, Not Property Valuation.**

State and federal authorities regulating mortgage servicing interpret "inspections" in this same way and, in fact, it is a defined and well-understood concept in the industry relating to property preservation—it does not include property valuations such as BPOs.

15

1.     *In Maryland, property inspections are part of property preservation following default.*

In 2014, the Maryland Office of the Commissioner of Financial Regulation ("OCFR") issued a notice entitled, "Advisory: **Property Preservation** – Nonjudicial Evictions."  Apx. 740 (emphasis added).  This Advisory defines "property preservation" as "the process of maintaining the interior and exterior of a building to prevent it from falling into disrepair."  *Id*.  It explains that "property preservation helps to ensure that lenders and mortgage holders are protected from further damages or costs associated with the property, and helps to keep neighborhoods free from blight."  *Id*.  It further explains that, when a borrower is in default, the mortgage servicer is responsible for property maintenance to ensure the property does not fall into disrepair.  *Id*.; *see also* Apx. 675, Tr. 56:14-19 ("[Property preservation] refers to certain actions taken by a mortgage servicer to ensure or to prevent a loss of value to a property to ensure that their interests are protected by ensuring that the value is not decreased based on a lack of -- poor maintenance or other similar factors, damage, et cetera.").

Accordingly, servicer responsibilities relating to property preservation include vacancy determinations, securing, lawn maintenance, winterization, and trash removal.  Apx. 740; Apx. 675-676, Tr. 57:5-58:9.  This same property preservation Advisory addresses the "Legality of Inspection Fees" because the OCFR understands that the prohibited fees in CL § 12-121 relates to property preservation (as the document is titled).  Apx. 741-742.  It explains that CL § 12-121 "prevents a lender from imposing an inspection fee in connection with a loan secured by residential real property" and that "*Taylor* [*v. Friedman*] remains good law in Maryland and applies to circumstances where a servicer orders a **visual inspection of property following default on the terms of a mortgage**."  *Id*. (emphasis added).

16

Consistent with this view, when the OCFR examined Shellpoint's mortgage servicing activities in Maryland and addressed visual property inspections, the OCFR focused only on visual property inspections.  Apx. 63.  There was no mention of property valuation.  *See generally id.*

The OCFR's interpretation of visual property inspections is consistent with federal regulators and entities like the Consumer Financial Protection Bureau ("CFPB"), HUD, and Fannie Mae.  The CFPB's Examination Procedures for Mortgage Servicing defines "property inspection fees" as "fees for inspections of the property so that the servicer can make sure that it is occupied and not abandoned."   CFPB   Examination   Procedures,   available   at https://files.consumerfinance.gov/f/documents/cfpb_910-mortgage-servicing-exam-procedures_2023-01.pdf  at 34 (last visited Feb. 4, 2024).  The CFPB further defines "property preservation fee" as "fees for services purchased to maintain the property in good condition and typically include lawn mowing, winterizing, and making repairs."  *Id.*

HUD requires visual property inspections following a borrower's default.  Fannie Mae does too, after 90 days of delinquency.  *See* Fannie Mae Servicing Guidelines, available at https://servicing-guide.fanniemae.com/, at D2-2-10 (last visited Feb. 4, 2024).[7]  Fannie Mae's standard form Deed of Trust, which the Parkers executed in connection with their mortgage, specifically includes a provision relating to visual property inspections in the context of property preservation and maintenance:

**7.  Preservation, Maintenance, and Protection of the Property; Inspections.**

\*       \*       \*       \*

---

[7] This provision is available online at https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-D-Providing-Solutions-to-a-Borrower/Subpart-D2-Assisting-a-Borrower-Who-is-Facing-Default-or/Chapter-D2-2-Requirements-for-Contacting-a-Borrower/D2-2-10-Requirements-for-Performing-Property-Inspections/1042371021/D2-2-10-Requirements-for-Performing-Property-Inspections-05-10-2023.htm  (last  visited Feb. 4, 2024).

Lender or its agents may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Apx. 447. Fannie Mae has its own form, Form 30, which sets forth the information required for a visual property inspection. *See* Fannie Mae Property Inspection Report, *available at* https://singlefamily.fanniemae.com/media/15346/display (last visited Feb. 4, 2024). As evident from Form 30, property inspections are directed towards determining occupancy and the property's general condition only. It has nothing to do with valuations:



## 2. Property valuation has nothing to do with property preservation.

Mortgage servicers like Shellpoint use property valuations to determine loan terms at loan origination or during a loan modification. Apx. 3, ¶ 11. Importantly, and in contrast to visual property inspections, the OCFR has ***never*** issued any advisories or opinions relating to BPOs. Apx. 668, Tr. 28:21-29:4 ("Q. Has the Commissioner's Office ever, to your knowledge, issued advisories to its licensees, mortgage servicer licenses, that they can charge BPO fees to borrowers? A. No, we have not.").[8] The OCFR understands BPOs are used for "reviewing the market conditions and expected sales price of a property." *Id.* at Tr. 29:7-11. The OCFR considers BPOs

---

[8] The OCFR does not regulate real estate brokers who perform BPOs. Instead, the Maryland Real Estate Commission regulates real estate brokers. BOP § 17-301 *et seq.*

to have a different purpose than visual property inspections, which are tied to property preservation rather than property valuation.  Apx. 678, Tr. 69:11-16.

Similarly, the CFPB defines BPOs as "broker price opinions, which provide estimates of the property value."  CFPB Examination Procedures, *available at* https://files.consumerfinance.gov/f/documents/cfpb_910-mortgage-servicing-exam-procedures_2023-01.pdf at 33 (last visited Feb. 4, 2024).  Fannie Mae defines BPO as "a written estimate of the probable sales price of a property performed by a real estate broker or sales person with or without an interior property inspection.  Commonly used for quality control and loss mitigation."  Fannie Mae Selling Guide, https://singlefamily.fanniemae.com/media/36761/display at 1117 (last visited Feb. 4, 2024).  Fannie Mae requires the same information for different types of property valuations, publishing standard forms for BPOs and appraisals.  Form 3/99, which is used for BPOs, requires information on comparable sales:

| III. COMPETITIVE CLOSED SALES | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM | SUBJECT | COMPARABLE NUMBER 1 | | | COMPARABLE NUMBER 2 | | COMPARABLE NUMBER 3 | | |
| Address | | | | | | | | | |
| Proximity to Subject | | REO/Corp☐ | | | REO/Corp☐ | | REO/Corp☐ | | |
| Sale Price | $ | $ | | | $ | | $ | | |
| Price/Gross Living Area | $        Sq. Ft. | $        Sq. Ft.. | | | $        Sq. Ft. | | $ Ft.        Sq. | | |
| Sale Date & Days on Market | | | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) Adjustment | | DESCRIPTION | +(-) Adjustment | DESCRIPTION | +(-) Adjustment | |
| Sales or Financing Concessions | | | | | | | | | |
| Location (City/Rural) | | | | | | | | | |
| Leasehold/Fee Simple | | | | | | | | | |

Apx. 744.  Fannie Mae's Form 1004, the Uniform Residential Appraisal Report, requires the same exact information:

**Uniform Residential Appraisal Report**                    File #

| There are | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ | | | | | to $ | | |
|---|---|---|---|---|---|---|---|---|
| There are | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ | | | | | to $ | | |
| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | | |
| Address | | | | | | | | |
| Proximity to Subject | | | | | | | | |
| Sale Price | $ | | $ | | $ | | $ | |
| Sale Price/Gross Liv. Area | $           sq. ft. | $           sq. ft. | | $           sq. ft. | | $           sq. ft. | | |
| Data Source(s) | | | | | | | | |
| Verification Source(s) | | | | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | |
| Sale or Financing Concessions | | | | | | | | |
| Date of Sale/Time | | | | | | | | |
| Location | | | | | | | | |
| Leasehold/Fee Simple | | | | | | | | |

Apx. 748.

### C.     Defendants, And The Rest Of The Mortgage Industry, Differentiate Between Visual Property Inspections And Property Valuations.

Defendants, like the entire mortgage industry, take their cue from state and federal regulators in distinguishing between visual property inspections and property valuations. While property inspections are low cost and do not require licensing or specialized training, BPOs are performed by licensed vendors who are required to be licensed and used for underwriting purposes.

### 1.     *Property inspections do not require specialized training or qualifications and entail nothing more than viewing properties.*

Pursuant to the various requirements identified above, mortgage servicers like Shellpoint engage third party vendors to conduct visual property inspections of the properties that secure the mortgage loans when borrowers go into default to determine whether the properties are being maintained properly, and that the property is not abandoned, going to waste, or otherwise damaged. Apx. 2, ¶ 5. Visual property inspections are also designed to determine whether a property has been or may be issued a citation by a municipality for a code violation (*i.e.*, tall grass), and whether the mortgagee must take action to repair the property or otherwise ensure that it is in good condition. Apx. 1-2, ¶ 4. Mortgage servicers are required to perform visual property inspections because studies suggest that defaulting homeowners, unable to make their mortgage payments,

20

likewise do not have the funds to maintain or repair their properties, and therefore defer maintenance.  Apx. 2, ¶ 7 (citing Kristopher Gerardi et al., *Foreclosure Externalities: New Evidence*, 87 J. URB. ECON. 42, 44 (2015)).

When Shellpoint began servicing Plaintiffs' loan effective October 4, 2019, Shellpoint sent a "Welcome Letter" to Plaintiffs that included a Fee Schedule that discloses the various fees associated with the servicing of their loan.  Apx. 499.  "Property Inspection Fee" is defined as a "[f]ee charged if we are required to determine the condition of your property."  Apx. 506.  Shellpoint disclosed that a Property Inspection Fee could cost $0 to $50.  *Id*.

In Maryland, Defendants' third-party vendors typically charge between $10-$15 for visual property inspections.  Apx. 96, 118, 130, 182, 245, 249, 253, 260.  As of the implementation of Shellpoint's automated process in September 2018, however, all charges associated with visual property inspections were billed directly to investors (like Goldman Sachs) rather than borrowers.  Apx. 8, ¶ 45.  In any event, the cost of a visual property inspection is comparatively low because these are fairly quick servicing activities that do not require specialized training.  Apx. 3, ¶ 9.  In fact, there are no state or federal licensing requirements for third party visual property inspection vendors.  *Id.*  ¶ 10.

> ### 2.     *BPOs are done by trained and licensed real estate brokers and therefore cost significantly more than property inspections.*

Property valuations like BPOs are used to determine the terms of a loan or modification of a loan.  *Id.* ¶ 11.  Shellpoint defines BPOs as "a valuation analysis typically completed by a real estate agent or broker" that "consists of an exterior inspection and a determination of market value based on comparisons to similar properties in close proximity that have recently sold or are currently listed for sale."  Apx. 40.  Unlike property inspections, a BPO is "very much like an appraisal but just done by a real estate agent versus an appraiser."  Apx. 11, Tr. 11:1-3; *see also*

*id.* at 11:4-9 ("[T]he agent would go to the property, they will assess the property, the neighborhood.  They will pull comparables, both sold and listing comparables.  They will make a determination of the value, and they give . . . us an as-is and an estimated repaired value for the property."); Apx. 650, Tr. 34:19-20 ("[T]hey're both used for the same purpose, to determine the relative value of a property.").

Shellpoint's "Welcome Letter" to Plaintiffs identifies "Property Valuation Fee" in the Fee Schedule.  Apx. 506.  It is defined differently than "Property Inspection Fee."  Whereas "Property Inspection Fee" relates to the determination of the condition of property, "Property Valuation Fee" is defined as a "[f]ee charged if we are required to determine the condition ***and value of your home***; may be in the form of a Broker Price Opinion, appraisal, or other Valuation of Property." *Id*. (emphasis added).  Shellpoint disclosed that a Property Valuation Fee could cost between $80 to $450—much more than a simple property inspection because it requires expertise and specialized work.  *Id*.  In Maryland, Defendants' third-party vendors typically charge between $105-$190 for residential BPOs.  Apx. 275, 290, 306, 342, 359, 368, 377, 387.  And unlike property inspections that require no training or licensing, individuals who perform BPOs must be licensed by the Maryland Real Estate Commission.   BOP § 17-301(a)(1).

BPOs are also subject to stringent internal procedures and quality standards that property inspections are not.  For instance, Shellpoint requires its valuation vendors to adhere to a professional standard of care including a quality control component to ensure they are delivering a quality product.  Apx. 16, Tr. 15:25-16:18.  Shellpoint also requires that consecutive BPOs on the same property not be completed by the same real estate agent, and that vendors follow standard distance guidelines for selecting comparable properties when completing valuations— requirements not present for property inspections.  Apx. 15-16, Tr. 17:-22-18:1.  Valuation

vendors' performance is also graded by Shellpoint using a scorecard and ranked against other valuation vendors. Apx. 21, Tr. 36:11-15. Shellpoint scores BPO vendors for timely completion of orders, completion of the data transmission, and accuracy of information provided. *Id.*, Tr. 37:7-16.

Shellpoint also uses different vendors to perform BPOs than the vendors it engages to perform property preservation activities such as inspections. Apx. 4, ¶ 19. Shellpoint has agreements with ServiceLink, SingleSource, Clear Capital, eStreet, AssetVal, and Meridian to perform valuation services such as BPOs. Apx. 16, Tr. 14:7-18. Those valuation agreements cover all kinds of valuations, including BPOs *and* appraisals, but they do not cover property preservation and inspection. Apx. 4, ¶ 19; Apx. 15, Tr. 15:14-24 ("A couple of those companies do supply those services, but that would be under a different SOW – a different statement of work, with a different department."). Shellpoint engages different companies—Safeguard, Cyprexx, and MCS—to perform property inspections in Maryland. Apx. 15, Tr. 13:11-13, 14:3-4; Apx. 76-271.

Here, Defendants never charged Plaintiffs with a property inspection fee; Shellpoint stopped charging borrowers for visual property inspections nearly a year before it even began servicing Plaintiffs' loan. Apx. 72-74. The only fee that Plaintiffs complain about is a property valuation fee in the amount of $105 identified in their November 2019 mortgage statement. Apx. 637. This valuation was performed because Mr. Cooper's records reflect that Plaintiffs were identified as candidates for loss mitigation assistance just before servicing transferred to Shellpoint. Apx. 493, Tr. 69:15-70:5; Apx. 496-497.

Of course the licensed real estate broker, Mr. Antoine B. Johnson, had to *look* at the property so he could determine how the property compares to the other properties with similar locations, lot size, and age that have sold recently, and were listed for sale, and assign a broker

price opinion to the property.  Apx. 622-624; Apx. 18, Tr. 23:10-13, 24:11-13. ("[T]he general standard for the industry is the agent makes the determination that the interior is like the exterior."). "As part of the valuation process, the real estate agent goes and looks at the property, because that is crucial to them being able to accurately assess the value of the property."[9]  Apx. 18, Tr. 22:13-16.  But that fact does not magically transform a valuation into an inspection.

The exterior property inspection was a small part of the valuation process; as evident from the BPO itself.  Mr. Johnson performed a comparative sale analysis of three other similar properties in Temple Hills, Maryland that sold within the last few months of his evaluation.

**SERVICELINK**                                      **Broker Price Opinion Exterior**

Order #: 25985818          Loan #: 0579128611          Client: Shellpoint - Loss Mitigation

| Comparative Sale Information | | | |
|---|---|---|---|
| | SUBJECT ADDRESS | COMPARABLE 1 | COMPARABLE 2 | COMPARABLE 3 |
| Street Address: | 6714 BERKSHIRE DRIVE | 5005 Colonial Dr | 6205 Summerhill Rd | 6711 Birch Ln |
| City, State, Zip: | TEMPLE HILLS, MD    20748 | Temple Hills, MD    20748 | Temple Hills, MD    20748 | Temple Hills, MD    20748 |
| Property Type: | Single Family | Single Family | Single Family | Single Family |
| Property Style: | Split Level | Split Level | Split Level | Colonial |
| Number of Units: | 1 | 1 | 1 | 1 |
| Proximity to Subject: | | 1.27 Miles | 1.37 Miles | 1.27 Miles |
| Sale Date: | 1/7/1994 | 6/21/2019 | 5/20/2019 | 5/7/2019 |
| Sold Price: | $145,900.00 | $357,000.00 | $325,000.00 | $320,000.00 |
| Days on Market: | | 30 | 4 | 475 |
| Location: | Average | Average | Average | Average |
| Lot Size: | 0.23 Acres | 0.37 Acres | 0.23 Acres | 0.65 Acres |
| Lot Size is: | Typical | Typical | Typical | Typical |
| Age in Years: | 60 | 56 | 54 | 51 |
| Condition: | Average | Average | Average | Average |
| Total Rooms: | 8 | 9 | 9 | 10 |
| Bedrooms: | 4 | 5 | 5 | 6 |
| Bathrooms: | 3 Full 0 Half | 2 Full 0 Half | 2 Full 1 Half | 3 Full 0 Half |
| Above Grade Sq. Footage: | 2717 | 2744 | 2312 | 2500 |
| Total Below Grade Sq.Ft.: | 0 | 1350 | 0 | 1250 |
| Garage: | 0.00 car / NA | 0.00 car / NA | 0.00 car / NA | 0.00 car / NA |
| Carport: | 0.00 car / NA | 1.00 car / Attached | 1.00 car / Attached | 0.00 car / NA |
| Comparison to Subject: | | Equal | Equal | Equal |
| Comparable Data Source: | | MLS | MLS | MLS |
| MLS Listing Number: | | MDPGS25792 | MDPG499756 | 1004167471 |

Apx. 623.  Mr. Johnson also reviewed the available listings of three other similar properties in Temple Hills, Maryland.  Apx. 624.  For both analyses, Mr. Johnson analyzed the comparable

---

[9] For instance, if the BPO agent sees that a property is "pristine and great landscaping and everything looks wonderful, they're going to assume that the interior of the property is . . . in as good of condition as the exterior.  If they were to pull up and the yard's overgrown and there's a hole in the roof and shutters are falling off, then they're going to assume that the property needs repairs both inside and out.  And so as they're making their . . . comparison to other properties in the neighborhood or market area, that's where they'll determine . . . this house is in great shape.  I feel like it might take $30,000 to bring the subject property to the same condition.  And that give them a basis to make their adjustments to the as-is value."  Apx. 18, Tr. 24:14-25:4.

properties, the available inventory of properties, and the market trends in the area. Apx. 622. Based on all of this information, Mr. Johnson set forth his opinion on the as-is and as-repaired price that Plaintiffs' property would fetch on the market. Apx. 625. Based on specific legal requirements in certain jurisdictions, Mr. Johnson included state-specific disclaimers that his BPO is not an "appraisal" as that term is defined in those states. Apx. 622. There is no disclaimer for Maryland. Apx. 633-635.

In sum, the plain language of the Usury Statute, as confirmed by the legislative history, establishes that an "inspection fee" is a fee charged in connection with a visual inspection of a property at loan settlement or for property preservation purposes, and does not include property valuation fees.

## II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS ON COUNTS II AND III BECAUSE THERE ARE NO MCDCA AND MCPA VIOLATIONS WITHOUT AN UNDERLYING VIOLATION OF THE USURY STATUTE.

In addition to CL § 12-121, Plaintiffs allege that by imposing a BPO fee, Defendants also violated the Maryland Consumer Debt Collection Act ("MCDCA") and Maryland Consumer Protection Act ("MCPA"). ECF 7 ¶¶ 64-79. Plaintiffs' MCDCA and MCPA claims are wholly derivative of their claim under the Usury Statute. *See generally* ECF 7. Because there is no Usury Statute violation, their derivative claims under the MCDCA and MCPA fail as well. *See Pollin v. Community Mgmt. Corp.*, No. GLR-22-1700, 2023 WL 6067119, at *4 (D. Md. Sept. 18, 2023) (dismissing MCPA claim derivative of MCDCA claim because plaintiff's "sole basis for relief is that [defendant's] violations of the MCDCA are per se violations of the MCPA . . . and [plaintiff] provides no other grounds establishing the viability of her claim").

Plaintiffs argue that Defendants violated CL § 14-202, because they "attempted to collect and did in fact collect unlawful property inspection fees." ECF 7 ¶ 68. Plaintiffs additionally

argue that Defendants' conduct constitutes a violation of the federal Fair Debt Collection Practices Act ("FDCPA"), which in turn would automatically violate the MCDCA, CL § 14-202(11). ECF 7 ¶ 69.  The FDCPA prohibits "false, deceptive, or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, and "unfair or unconscionable means to collect or attempt to collect any debt."  *Id.* § 1692f.

Although Plaintiffs claim that their MCDCA claim is "brought in the alternative" to its claim under CL § 12-121, the MCDCA claim depends on a violation of CL § 12-121 in order to be viable.  Absent a determination by this Court that Defendants' imposition of a BPO charge was an unlawful inspection fee under the Usury Statute, there is no other authority that prohibits such a fee which would violate the MCDCA.  Likewise, Plaintiffs do not, and cannot, provide any alternative reason for why charging and attempting to collect a BPO fee would be deceptive, misleading, unfair, or unconscionable under the FDCPA other than that the fee is prohibited by law.  Therefore, Plaintiffs' MCDCA claim fails as a matter of law.[10]

Plaintiffs further allege that Defendants' violation of the MCDCA is a *per se* violation of the MCPA.  ECF 7 ¶ 70.  For much of the same reasons that if there is no CL § 12-121 violation then there is no MCDCA, if there is no MCDCA violation then there is also no MCPA violation. Plaintiffs' sole remaining allegation[11] that Defendants violated the MCPA is based on CL § 13-301(14)(iii), which states that "[u]nfair, abusive, or deceptive trade practices include any violation of a provision of Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act."

---

[10] Even if this Court finds that the BPO fee at issue in this case is an unlawful inspection fee under CL § 12-121, there is still no MCDCA violation because the charged was never assessed to or paid by Plaintiffs.

[11] There is no standalone MCPA claim; that claim was dismissed by Judge Hazel a year and a half ago.  *See Parker*, 596 F. Supp. 3d at 572.

Because Defendants did not violate the Usury Statute, and in turn did not violate the MCDCA, Defendants did not violate the MCPA either.[12]

### III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS ON PLAINTIFFS' CLAIM FOR DAMAGES.

Plaintiffs are not entitled to statutory damages, actual damages, or attorneys' fees under any of the statutes in which they brought their claims.

*First*, Plaintiffs are not entitled to statutory damages under the Usury Statute because, as explained above, there is no violation of that Statute.

*Second*, Plaintiffs are not entitled to damages under the MCDCA or MCPA because there are no violations of those statutes either.

*Third*, Plaintiffs do not have any actual damages because they were not charged the BPO; instead, Goldman Sachs paid those charges.  As explained above, as of October 23, 2019, Plaintiffs had a $952.60 balance for late charges on their loan.  Apx. 513.  On November 8, 2019, a $105 BPO charge and a $105 BPO reversal was made on Plaintiffs' loan.  *Id*.  The "Transaction Activity" section of Plaintiffs' November 13, 2019 monthly mortgage statement sets forth these two transactions dated November 8, 2019.  Apx. 637.  Under the "Explanation of Amount Due" section of the same mortgage statement, the $105 charge appears in the "Total Fees and Charges" line item.  *Id*.  The "Overdue Payment" line item shows $847.60, which represents the $952.60 balance for the late charges on the loan minus the $105 reversal.  *Id*.  In other words, the charge

---

[12] In addition, simply charging an allegedly unlawful fee is not sufficient to support an MCPA claim because reliance on the allegedly deceptive act is required.  *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012) (citing *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 143 (2007)) ("[A] consumer bringing a private action for damages under § 13-408 must allege (1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury.").  "A consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice."  *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 532 (D. Md. 2011).  Here, Plaintiffs cannot have relied on the charges and payments in their November 2019 Mortgage Statement because they were adamant that they were current on their mortgage, and immediately called Shellpoint to dispute the BPO.  Apx. 558, Tr. 78:10-79:15.

and reversal canceled each other out.  The charge and the credit were applied to Plaintiffs' account

and they never paid any fees relating to the BPO.  Instead, Goldman Sachs paid for the BPO.  Apx.

7, ¶ 35.

      ***Finally***, Plaintiffs are not entitled to attorneys' fees because they do not have viable claims

as a matter of law.

## IV.    THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS BECAUSE PLAINTIFFS ARE NOT MEMBERS OF THE CLASS THEY SEEK TO REPRESENT.

      The Court should strike Plaintiffs' class claims for the simple reason that Plaintiffs are not

members of the class and subclass they seek to represent.  *See* 7A Charles Alan Wright & Arthur

R. Miller, Fed. Prac. & Proc. Civ. § 1761 (3d ed.), § 1761.  Whether a plaintiff can bring a class

action on behalf of a class to which they themselves are not a member is often analyzed as part of

Rule 23(a)(3), which states that a class action can be brought only if "the claims or defenses of the

representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

The Fourth Circuit has held that "[t]ypicality requires that the claims of the named class

representatives be typical of those of the class; 'a class representative must be part of the class and

possess the same interest and suffer the same injury as the class members.'"  *Lienhart v. Dryvit

Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,

156 (1982)).

      Alternatively, a plaintiff's membership in a proposed class may be considered under Rule

23(a)(4), which mandates that "the representative parties will fairly and adequately protect the

interest of the class." Fed. R. Civ. P. 23(a)(4).  For example, this Court has held that class

certification is inappropriate where a plaintiff "failed to show that she is a member of the proposed

class."  *Herron v. Mayor and City Council of Annapolis, Md.*, 388 F. Supp. 2d 565, 573 (D. Md.

2005) (denying class certification where plaintiff sought to represent class of individuals who had

paid an allegedly improper "impact fee," but plaintiff herself had not paid the impact fee), *aff'd*, 198 Fed. Appx. 301 (4th Cir. 2006).

Regardless of which Rule governs this issue, or if the issue is an "unwritten pre-requisite of Rule 23," *id.* at 573, it is well-established that a representative plaintiff must be a member of the class he or she seeks to represent.

Here, Plaintiffs seek to represent a class defined as:

> Those persons in the State of Maryland for whom (i) Shellpoint has acted as a maker or assignee of a mortgage loan related to a secured, mortgage loan at any time or a licensed mortgage servicer of a mortgage loan owner related to a secured, mortgage since January 1, 2019; (ii) where ***Shellpoint charged their mortgage loan accounts with property inspection fees and costs related to the mortgage loan***; and (iii) the mortgage loan accounts had not been satisfied more than six months before the commencement of this action.

ECF 7 ¶ 35(a) (emphasis added).  Plaintiffs further propose a sub-class for which Goldman Sachs was the investor.  *Id.* ¶ 35(b).  Accordingly, a prerequisite to membership in this class is the borrower's being charged with a property inspection fee.

As explained above, however, Plaintiffs were never charged with a property inspection fee. Defendants ordered a BPO that was not addressed or prohibited by the Usury Statute.  And, Plaintiffs were never charged for the BPO.  Nor did they pay for it.  Instead, the undisputed record establishes that Goldman Sachs paid for the BPO.  Thus, Plaintiffs are not part of the class that they wish to represent and the Court should strike the class allegations.  *See Pelino v. Ward Mfg., LLC*, No. 14-cv-02771-RDB, 2015 WL 4528141, at *4 (D. Md. July 25, 2015) (granting motion to strike class allegations because the named plaintiffs' own admission "distinguish themselves from the rest of the class"); *see also Robinson v. Nationstar Mortgage LLC*, No. CV TDC-14-3667, 2019 WL 4261696, at *15 (D. Md. Sept. 9, 2019) ("[N]amed class representatives . . . [can]not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (quoting *Cent. Wesleyan Coll. v. W.R.*

*Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993); *see also id.* (quoting *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023 (9th Cir. 2003) ("[I]f [plaintiff] has no stacking claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail."); *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (citation omitted).

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth above, the Court should grant Defendants' Motion for Summary Judgment and to Strike Class Allegations.