**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | | |
|---|---|---|
| **MICHAEL T. PARKER** | * | |
| **PATRICE PARKER** | | |
| **ALICE MEJIA** | * | |
| Plaintiffs/Intervenor | | |
| *On behalf of themselves individually and* | * | Civil Case No.:  8:20-cv-03581-ADC |
| *a class of similarly situated persons* | | |
| | * | |
| v. | | |
| | * | |
| **GOLDMAN SACHS MORTGAGE** | | |
| **COMPANY, LP** | * | |
| **And** | | |
| **NEWREZ LLC d/b/a SHELLPOINT** | * | |
| **MORTGAGE SERVICING** | | |
| | * | |
| *Defendants.* | | |

**PLAINTIFFS' <u>CORRECTED</u> OPPOSITION AND RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND TO STRIKE CLASS
ALLEGATIONS, STATEMENT OF UNDISPUTED MATERIAL FACTS, AND RESPONSE AND
OBJECTIONS TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Scott C. Borison
Federal Bar No. 22596
**BORISON FIRM LLC**
1400 S. Charles St.
Baltimore MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

Phillip R. Robinson
Federal Bar No. 27824
**CONSUMER LAW CENTER LLC**
10125 Colesville Road, Suite 378
Silver Spring, MD 20901
Telephone (301) 448-1304
phillip@marylandconsumer.com

Thomas J. Minton
Federal Bar No. 03370
**GOLDMAN & MINTON, P.C.**
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Telephone (410) 783-7575
Fax (410) 783-1711
*tminton@charmcitylegal.com*

*Counsel for Plaintiffs & Putative Class Members*

TABLE OF CONTENTS

**Page**

I.        Introduction                                                                        1

II.       Statement of Material Facts in support of their opposition:         2
          The Core Junk Fee at Issue

III.      Plaintiffs' Responses to Defendants' Statement of Facts              9

IV.       Standards of Review                                                              14

V.        Argument                                                                          14

          a.   Longstanding Law and Precedent Bars Shellpoint from        14
               Imposing Usurious Fees Upon any Maryland Mortgage
               Borrower but It Did So Anyway

          b.   The Statutory Definition of "Inspection Fee" in COM.          16
               LAW § 12-121(a) Controls and No Label Given to it by
               Shellpoint has Any Weight; There is No Dispute that the
               Inspection Fee Imposed by Shellpoint onto the Parkers'
               Mortgage was for a Visual Inspection of Their Property

          c.   The General Assembly Established Statutory                      18
               Exemptions to the Inspection Fee Bar in COM. LAW §
               12-121; It would be improper for this Court to Expand
               Upon those Exemptions to Include BPOs of Any Other
               Similar Fee Not Stated

          d.   The Plain Language of Maryland Law Controls the               20
               Question Before the Court About "Inspection Fees;"
               Shellpoint Admits it Imposes Multiple Different
               Inspection Fees onto the Accounts of the Maryland
               Borrowers Just Like It Did for the Parkers

          e.   COM. LAW § 12-121 is Not Limited to Inspection Fees          22
               Arising Only from Alleged Mortgage Defaults

          f.   The Defendants and Their "Mortgage Industry"                   24
               Standard Arguments Ignore Clear, Ambiguous
               Maryland Law Incorporated into Every Standard
               Mortgage Contract in Maryland

TABLE OF CONTENTS

**Page**

V.      Argument (continued)

       g.   The Defendants are not Entitled to Summary Judgment       26
on the Parkers' Debt Collection Claims

       h.   The Parkers' Actual Damage Claims Survive Based          26
upon the Disputed Material Facts and the Pre-judgment
Interest they Are Entitled to as a Matter of Maryland
Law

       i.   Shellpoint's Arguments Under the MCDCA and MCPA          28
are Unavailing

       j.   Because the Parkers' Individual Claims Survive and for   28
the Reasons Stated in their Motion for Class
Certification, Defendants' Effort to Stike the Class
Allegations Should be Denied

       k.   The Court Should  Enter an Order that the Defendants     29
Imposed an Illegal Inspection Fee to the Plaintiffs

VI.     Conclusion                                                    29

      L.R. 105.3 Reprinting of Statutes & Other Authorities Cited    32
Herein

TABLE OF AUTHORITIES

**Page**

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) — 14

*Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370 (4th Cir. 2022) — 15, 20-21

*Allstate Ins. Co. v. Fritz*, 452 F.3d 316 (4th Cir. 2006) — 14, 29

*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) — 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) — 14

*Andrus v. Glover Const. Co.*, 446 U.S. 608 (1980) — 20

*Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) — 21

*Brenner v. Plitt*, 34 A.2d 853 (1943) — 22

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) — 21

*Buxton v. Buston*, 363 Md. 634 (2001) — 27

*Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643 (4th Cir. 2004) — 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) — 14

*Chavis v. Blibaum & Assocs., P.A.*, 264 A.3d 1254 (2021) — 15

*Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767 (2018) — 17-18

*Emmett v. Johnson*, 532 F.3d 291 (4th Cir. 2008) — 14

*Fidelity Union Tr. Co. v. Field*, 311 U.S. 169 (1940) — 15

*Gambo v. Bank of Maryland*, 102 Md. App. 166 (1994) — 17-18

*Harford Cnty. v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73 (2007) — 27

*Hillman v. Maretta*, 569 U.S. 483 (2013) — 20

*Holdren v. Legursky*, 16 F.3d 57 (4th Cir. 1994) — 15

*I. W. Berman Properties v. Porter Bros.*, 276 Md. 1 (1975) — 27

*Johnson v. Sootsman*, 79 F.4th 608 (6th Cir. 2023) — 21

TABLE OF AUTHORITIES

**Page**

*Matter of Smart Energy Holdings, LLC*, --- A.3d ----, 2024 WL 719231 (Md. Feb. 22, 2024) ... 25

*Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296 (2021) ... *passim*

*Patton v. Wells Fargo Fin. Maryland, Inc.*, 85 A.3d 167 (2014) ... 16

*Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646 (4th Cir. 2017). ... 14

*Phillips v. Ford Motor Co.*, 435 F.3d 785 (7th Cir  2006) ... 28-29

*Plitt v. Kaufman*, 53 A.2d 673 (1947). ... 18, 21

*Shader v. Hampton Improvement Ass'n, Inc.*, 94 A.3d 224 (App. Ct. Md. 2014) ... 27

*Tanzin v. Tanvir*, 592 U.S. 43 (2020) ... 18

*Taylor v. Friedman*, 689 A.2d 59 (Md. 1997) ... *passim*

*Yates v. NewRez LLC*, --- F.Supp.3d ----, 2023 WL 5108803 (D. Md. 2023) ... *passim*

**Statutes**

15 U.S.C.A. § 1638 ... 12

Com. Law § 12-114 ... *passim*

Com. Law § 12-121 ... *passim*

Com. Law § 14-202 ... 12

Corps. & Ass'ns § 5-6B-04 ... 25

Health-Gen. § 15-1102 ... 25

Public Safety §  3-511.1 ... 25

Real Prop. § 11-131 ... 25

W.VA. Code Section 46A-2-115 ... 24

**Regulations & Rules**

12 C.F.R. § 1026.41 ... 12

TABLE OF AUTHORITIES

**Page**

Fed. R. Civ. P. 56                                                          14, 29

**Other Authorities**

Definition provisions, 2A Sutherland Statutory Construction §      17-18
47:7 (7th ed.)

*NewRez LLC d/b/a Shellpoint Mortgage Servicing v. Irene Yates*,      1
Fourth Circuit (Case No. 23-240) at ECF. 15

Oregon House Bill 4204 (enrolled)(during the 80th Oregon             24
Legislative Assembly – 2020 Special Session)

Plaintiffs Michael and Patrice Parker ("Mr. & Mrs. Parker" or "Plaintiffs"), oppose Defendants Goldman Sachs Mortgage Company Limited Partnership ("Goldman") and NewRez LLC d/b/a Shellpoint Mortgage Servicing's ('Shellpoint")(collectively "Defendants") Motion for Summary Judgment and to Strike Class Allegations (ECF 60)("Motion") and state the following:

## I.    INTRODUCTION

This case, and its companion case *Yates v. NewRez LLC*, --- F.Supp.3d ----, 2023 WL 5108803 (D. Md. 2023), both concern the junk fee practices of Shellpoint and its clients in violation of longstanding Maryland law.  More specifically, each case concerns Shellpoint's on-going pattern and practice of imposing statutorily defined, illegal inspection fees onto the mortgage accounts of Maryland mortgage borrowers in violation of Maryland's usury and consumer protection laws.  As explained by the Maryland Supreme Court "since money is fungible and people are creative, efforts to circumvent the restrictions of the Usury Law have sometimes taken the form of fees or other charges that were assessed to the borrower." *Nationstar Mortg. LLC v. Kemp*, 258 A.3d 296, 302 (2021).  In addition, "[u]sury is a moral taint wherever it exists and no subterfuge shall be permitted to conceal it..." *Id.* (cleaned up)

Shellpoint's practices are not new.  It previously was caught violating this same Maryland law by the OCFR, for the same practices.  *Yates,* 2023 WL 5108803, at *1 ("…the Maryland Commissioner of Financial Regulation…found that Shellpoint had charged to or collected from Maryland borrowers more than $270,000 in illegal inspection fees").  Here, Defendants' new and repeated arguments were rejected previously by the Maryland appellate courts and in the *Yates* action.  Shellpoint sought review in the Fourth Circuit in *Yates* and the effort was denied based on its arguments it repeats here.  *NewRez LLC d/b/a Shellpoint Mortgage Servicing v. Irene Yates*, No. 23-240 at ECF. 15. While every mortgage servicer like Shellpoint, or mortgage owner like

Goldman, might wish they have the right to decide what fees they can charge by how they choose to label them, ignoring the law and rules governing their conduct, they simply are not permitted to profit from their usurious conduct.  In their own words, the Defendants have explained:

> ...the statutory remedy available under Com. Law 12-114(b)(1) is directly tied to the alleged amount of interest that was collected. While Defendants provide that the penalty for each violation is $500…the code section actually provides the choice of two remedies....Com. Law 12-114(b)(1). So, while the $500 penalty alleged by Plaintiffs' here is the greater of the two alternatives…the remedy that the legislature is providing is directly tied to the actual, concrete harm that a plaintiff would suffer.

ECF. 22 at Page 7.

In this action, the Parkers seek to represent all other Maryland borrowers not in the *Yates* action.  Knowing this, Defendants seek to avoid the result they foresee from their own analysis and instead seek to have this Court establish judicial exceptions for them – none of which the General Assembly included in the actual exemptions it established to the remedial laws at issue.  The plain language of COM. LAW §§ 12-114, 12-121 applies to the fee and conduct at issue.  Also, the binding precedents of the U. S. Supreme Court, U.S. Fourth Circuit, and the Maryland Supreme Court control the questions presented in this action—not Minnesota law or alleged industry standards which do comply with longstanding Maryland law that is incorporated into nearly every standard mortgage contract, all of which "incorporate[s] 'Applicable Law,' including § 12-121 prohibiting such [] inspection fee[s]."  *Kemp*, 258 A.3d at 322.

The Court should reject Defendants' efforts to again avoid accountability for their ongoing usurious practices.

## II.   STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR OPPOSITION:  THE CORE JUNK FEE AT ISSUE

**Material Fact ("MF") I:** Shellpoint routinely conducts visual inspections of Maryland real properties in a variety of manner and forms. *See* New Rez Dec., ECF 1-5 at ¶ 8 (**Apx. 130-**

**131**).[1] Shellpoint also routinely conducts visual inspections of Maryland real properties in a variety of manners and forms for loans held by Goldman. *Id*. In regard to these visual inspections: **(a)** Shellpoint's own corporate designee in *Yates* admitted a BPO or a drive-by inspection are just two types of property inspections conducted by Shellpoint involving exterior inspection of subject properties;[2] **(b)** For Shellpoint, a BPO always entails a visual inspection of the property.[3] It is always a drive-by visual inspection;[4] **(c)** In this action again Shellpoint's designees readily admit, as it did in *Yates,* that it conducts multiple types of inspections on a routine basis with a variety of vendors;[5] **(d)** Shellpoint also admits the "BPO" imposed and related fee upon the Parkers and other borrowers involves a visual inspection of the exterior of the borrowers' property;[6] **(e)** The Maryland agency which licenses Shellpoint to perform its mortgage business agrees with the Office of Maryland's Attorney General that an inspection fee is "a fee imposed by a lender or a credit grantor to pay for a visual inspection of real property."[7] And in response to Shellpoint's own inquiry, its own agent agrees a visual inspection typically includes determining whether a property is occupied or vacant (just as occurred with the BPO inspection

---

[1] References herein as "**Apx. ____**" refer to Plaintiffs' Appendix of Exhibits (filed at ECF. 68-1, 68-2, 68-4, & 68-4) and cite to the specific page(s) as the source for the fact asserted.  *See also Yates* 2023 WL 5108803, *2 ("In a June 22, 2018 monthly statement, Shellpoint charged Yates $105.00 and $20.66 in property inspection fees").
[2] Dep. of Knowles (20:16 to 23:6)(**Apx. 3-4**).
[3] Dep. of McCormick (11:10 to 11:17)(**Apx. 9**).
[4] Dep. of McCormick (22:13 to 23:2)(**Apx. 12**); ServiceLink Website description of BPO(Apx. 30).
[5] Dep. of Cooper (11:2 to 12:12)(**Apx. 33-34**); Dep of Hughes (23:22 to 25:7; 36:12-22; 39:20 to 40:11)(**Apx. 52-51, 56-57**).  *See also* **MF V** *infra*.
[6] Dep. of Cooper (35:14 to 37:2)(**Apx. 39-40**).  Parker BPO(**Apx. 66-74**); Shellpoint Cover Letter with Copy of Parker BPO(**Apx. 65**).
[7] Dep. of Charland (36:15 to 37:7)(**Apx. 84**); Nationstar Assurance of Discontinuance(ECF. 7-3)(**Apx. 99-100**).

3

of the Parker Property);[8] **(f)** The drive-by inspection is used by Shellpoint to assess the condition of the property as well as can be ascertained from just driving past it. Typically, the agent does not get out of his car, but does the inspection "basically from the street";[9] **(g)** The inspection usually takes only 5-10 minutes. It is intended to see if there is any evident damage;[10] **(h)** ServiceLink's witness, (who hires the real estate agent for the BPO's, then bills Shellpoint for the service), agrees the real estate agent is not supposed to even get out of the car to perform the inspection;[11] **(i)** The non-appraiser real estate firm utilized by Shellpoint to perform the BPO of the Parkers' Property confirms property preservation services are also based upon visual inspections and include determining whether the Parkers' Property appeared occupied or was vacant;[12] **(j)** The non-appraiser real estate firm utilized by Shellpoint to perform the BPO of the Parkers' Property confirms the report was based upon a visual inspection of the Parker Property and other similar properties and involved visual photographs of the exterior of the Parker property and a "huge portion" of a BPO is a visual inspection of the property;[13] **(k)** According to Shellpoint's witnesses, ServiceLink's explicit language on the Parkers' BPO report confirms a BPO is not an appraisal;[14] **(l)** Indeed, ServiceLink readily acknowledges the distinction between a BPO and an appraisal: "when it's not completed by an appraiser, and it's not in an appraisal form, … it's completed by a real estate agent…. [T]here is specific language that defines an

---

[8]      Dep. of Charland (56:13 to 57:9, 60:3-17; 81:3-20)(**Apx. 89-90, 95**); Dep of Hughes (38:8-19)(**Apx. 56**); Parker BPO (**Apx. 65-74**).

[9]      Dep. of McCormick (23:22 to 24:8)(**Apx. 12**).

[10]     Dep. of Cooper (35:17 to 36:9)(**Apx. 39-40**).

[11]     Dep. of Hughes (23:22 to 24:24)(**Apx. 52-53**).

[12]     Dep. of Dunton (Page 20:4 to 20:13)(**Apx. 115**).

[13]     Dep. of Dunton (Page 11:11 to 11:19; 12:19 to 13:20; 23:15 to 23:18; Page 32:1 to 33:131) (in response to Shellpoint's direct inquiry); Pages 37:7 to 38:3) (**Apx. 113, 116, 118-120**).

[14]     Parker BPO (Apx. 65-74); Dep. of McCormick (34:8 to 34:25)(**Apx. 15**); Dep. of Hughes (19:16 to 19:25)(**Apx. 51**).

appraisal legally for use purposes and state requirements";[15]  The BPO "is not an appraisal of the market value of the property";[16]  and **(n)** The only purpose of the BPO is to assist the Defendants in making decisions: "for their use, depending on what their use is for, that they have to have a value, they have to make a decision, or they may not. So this is just to provide them … a value of the property to aid in whatever use that they need it for."[17]

**MF. II.**  Shellpoint imposes fees onto the accounts of Maryland mortgage borrowers related to inspections.  For example, **(a)** Shellpoint imposed a fee for a visual inspection on the Parkers;[18]  **(b)** The OCFR expects Shellpoint and all its other licensees to send statements to borrowers which are accurate;[19]  **(c)** In discovery, Shellpoint has provided voluminous data which identifies thousands of borrower accounts in Maryland that were assessed BPO fees since 2014;[20] **(d)** Shellpoint's affidavit in support of removal of this action to this Court states that "from January 1, 2019 to the present, Shellpoint has assessed at least 35,838 property inspection fees in connection with Maryland loans";[21]  **(e)** Before the Fourth Circuit in *Yates* Shellpoint recently made the following representation: "In discovery, Shellpoint prepared then produced, a spreadsheet setting forth all fees coded in its system as inspection fees from 2014 to 2018 on all Maryland loans.  Dkt. 63, Ex. 1.  That data showed 28,993 total fees allegedly charged by

---

[15]      Dep. of Hughes (30:5 to 30:10)(**Apx. 54**).
[16]      Dep. of Hughes (41:6 to 41:18)(**Apx. 57**); ServiceLink Website description of BPO(**Apx. 30**); Parker BPO (**Apx. 65-74**).
[17]      Dep. of Hughes (**40:6 to 40:11**)(Apx. 57); ServiceLink Website description of BPO (**Apx. 30**).
[18]      Shellpoint Statement to the Parkers (11/13/2019)(**Apx. 191-193**); Dep. of Charland (48:18 to 49:20)(**Apx. 87**).  *See also* **MF. I** *supra*.
[19]      Dep. of Charland (48:12 to 49:20)(**Apx. 87**).
[20]      FED. R. EVID. 1006 Summary of Production by Shellpoint (Bates no. Shellpoint_Parker_008217, *et seq*. produced by the Defendants); Dep. of McCullough (35:18-36:20)(**Apx. 806**).
[21]      Costello Aff. (ECF 1-5 at para. 8(d))(**Apx. 127-131**).  *See also* Costello Aff. from *Yates* (**Apx. 122-126**).

Shellpoint from March 2014 through December 2018 in Maryland.  *Id.* … The current record in this case does not translate fees into borrowers, or narrow the scope to Fannie Mae loans… [or include those loans where Shellpoint imposed an inspection fee characterized as a BPO]";[22] **(f)** Shellpoint's position is that no Federal or State regulations govern its BPO practices[23] and its compliance department decides whether a fee may be charged to a borrower or not;[24] **(g)** Shellpoint regularly imposes a $105 fee upon borrowers for BPO's;[25] **(h)** Shellpoint represented to the Parkers, in a monthly statement it issued to them, under "Explanation of Amount Due," that they had been assessed a fee in the amount of $105 for a BPO, which included a drive-by inspection of the home, and which the statement misleadingly labeled a "BPO/Aprsl";[26] **(i)** In that same statement, Shellpoint represented that the "overdue amount" was $847.60 not the $952.60 that Shellpoint now claims.[27]  Shellpoint's designee witness agrees that the $847.60 figure would have come from the Servicing Director system that Shellpoint maintains as the computer database of record for its borrowers' account;[28] **(j)** The "overdue amount" figure of $952.60 is exactly $105 higher than the figure represented as overdue in the 11/13/2019 statement, and that higher figure became the "overdue" amount on subsequent statements for at least a year.[29]

---

[22]   Shellpoint Rule 23(f) Petition to the Fourth Circuit at pp. 8-9, FN 2 (**Apx. 147-148**).
[23]   Dep. of McCormick (31:3 to 31:9; 57:9 to 57:20) (**Apx. 14, 794**).
[24]   Dep. of McCormick (42:6 to 42:20)(**Apx. 793**).
[25]   Dep. of McCormick (65:1 to 65:3)(**Apx. 22**).  *See also* FNs 19 & 21 *supra*.
[26]   Dep. of McCormick (72:16 to 72:21)(**Apx. 24**); Shellpoint Statement to the Parkers (11/13/2019)(**Apx. 191-193**).  *See also* FNs 19 & 21 *supra*; Dep. of Charland (48:18 to 49:20)(**Apx. 87**).  *See also* **MF. I** *supra*.
[27]   Shellpoint Statement to the Parkers (11/13/2019)(**Apx. 191-193**).
[28]   Dep. of Cooper (48:18 to 50:24)(**Apx. 43**).
[29]   *See e.g.* Shellpoint Statement to the Parkers (12/12/2019)(**Apx. 194-196**); Shellpoint Statement to the Parkers (11/18/2020)(**Apx. 786**)

**MF. III**:  BPOs and other inspection fees conducted for Shellpoint are performed by non-appraisers. The BPO of the Parker's property was not done by a licensed appraiser.[30]

**MF. IV:**     The Maryland agencies that regulate Shellpoint, licensed real estate professionals, and licensed appraisers, all agree that no law or regulation permits the imposition of fees related to a BPO to be charged to a borrower. Even Shellpoint's predecessor Nationstar (now) knows the laws of Maryland and no longer imposes inspection fees on borrowers.[31]  In addition: **(a)** The Office of the Commissioner of Financial Regulation ("OCFR") notified Shellpoint and all other OCFR licensees since 2014 that they were not permitted to impose inspection fees, defined by statute, on borrowers;[32] **(b)** OCFR also expects its licensees to know the laws governing their activities as part of their license to do business in the State of Maryland;[33] **(c)** Since 2004, the Maryland Real Estate Commission has not permitted its licensees to represent that a BPO constituted an appraisal under Maryland law. Neither do the Real Estate Commission's statutory and regulations expressly authorize fees to be imposed on consumers when a real estate professional performs a BPO for a mortgage servicer;[34] **(d)** The Maryland Commission of Real Estate Appraisers, Appraisal Management Companies, and Home Inspections recognizes that under Maryland law since 1989 a real estate appraisal may only be performed by an individual

---

[30]     Dep. of Dunton (9:20 to 10:5)(**Apx. 112-113**). *See also* **MF. I** *supra*.
[31]     Dep of Hyne (35:8-19)(**Apx. 205**).
[32]     Dep. of Charland (11:12 to 19:5; 42:13 to 43:2; 63:2 to 64:9)(**Apx. 78-80, 86, 91**); OCFR Advisory Notice (1/7/2014)(**Apx. 216-217**); OCFR Advisory Notice (10/14/2021)(**Apx. 219**); Charland Affidavit from *Kemp v. Nationstar* (less exhibits attached thereto)(Apx. 220-228).
[33]     Dep. of Charland (28:5 to 29:4)(**Apx. 82**).
[34]     Kasnic Aff. at ¶¶ 6-8 (**Apx. 229-230**).  *See also* Dep. of Charland (46:14 to 47:2)(**Apx. 97**).

with an "appraisal credential" by the agency.  Nor do the Real Estate Commission's regulations authorize fees to be imposed on consumers related to a BPO.[35]

**MF. V:**  The label or name given to any fee by Shellpoint does not control whether the fee qualifies as an inspection fee since it is defined by Maryland law according to the OCFR.[36]

**MF. VI**: While Shellpoint reclassified some inspection fees after it imposed on Maryland borrowers in the past, its designee does not know if the reclassification process involved every fee related to property inspections including BPO fees.[37]  On examination by its own counsel Shellpoint also does not even know if it ever explained to any borrower how it reclassified any inspection fees except as an unexplained credit or debit.[38]

**MF**. **VII**: In September 2019, when the Parker loan was owned by Goldman Sachs but serviced by Nationstar Mortgage LLC ("Nationstar"), the loan was current and the Parkers had not applied for loss mitigation.[39]

**MF. VIII:** When the Parker Loan was transferred to Shellpoint from Nationstar, the loan was current and not in default. Nationstar did not order any BPO nor was it owed any inspection fees from the Parkers.[40]

**MF. IX**:  Shellpoint never made inquiries to Nationstar about the Parker Loan after the servicing transfer.[41]

**MF X:** It has already been determined in *Yates* that Shellpoint can readily identify the

---

[35]        Blackistone  Aff. at ¶¶  5-9 (**Apx. 232-233**).  *See also* Dep of Charland (45:20 to 46:13)(**Apx. 96-87**).
[36]        Dep. of Charland (53:6 to 54:8)(**Apx. 88-89**).
[37]        Dep. of Cooper (21:10-23)(**Apx. 36**)
[38]        Dep. of Cooper (58:10 to 59:3)(**Apx. 45**)
[39]        Dep of Hyne (21:9-17; 24:3 to 25:12; 25:23 to 26:18; 28:3-10; 64:2 to 65:3)(**Apx. 202-204, 213**); Nationstar Communications Log(**Apx. 638-639**).  *See also* **MF II(i)-(j).**
[40]        Dep of Hyne (30:13 to 31:18; 32:4-12; 35:8-12)(**Apx. 204-205**).
[41]        Dep of Hyne (29:9 to 30:12)(**Apx. 204**).

class members and subclass members, and that the number far exceeds 100 persons. Indeed, Shellpoint: **(a)** Admits it identified 35,838 inspection fees[42] charged to those Maryland borrowers with "active" loans from January 1, 2019 to December 10, 2020 and that number does not include BPOs;[43] **(b)** Admits that those thousands of fees identified in ¶ (a) involved more than 100 Maryland borrowers of Shellpoint and for Goldman; **(c)** Shellpoint's sworn testimony filed in support of Defendant's Notice of Removal, ECF 1-5 shows it can identify the imposition of the charges at issue;[44] **(d)** As to its assessment of fees against homeowners for BPO's Shellpoint's has a produced a spreadsheet showing that 6,145 such fees were assessed against Maryland homeowners from 2014 forward;[45] **(e)** After completing a review of Shellpoint's records that began in 2015, the Maryland Commissioner of Financial Regulation found that Shellpoint had charged to or collected from thousands of Maryland borrowers more illegal inspection fees;[46] **(f)** In seeking review in the Fourth Circuit of the grant of class certification in *Yates,* Shellpoint asserted that there it imposed inspection fees on Maryland homeowners more than 28,000 times since 2014.

## III.   PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF FACTS[47]

**DEFENDANTS 1:  Plaintiffs previously modified their mortgage loan and owed late fees when Shellpoint became their servicer in October 2019. DEFENDANTS 1.1:  Plaintiffs bought their home in 1993 and previously were in foreclosure and had defaulted on their**

---

[42]     Dep. of Glanz (29)(explaining generally inspection reports are necessary to report on visual assessment of the secured property).

[43]     Costello Aff. (ECF 1-5 at para. 8 (Apx. 127-131); Shellpoint's Amended Answers to Interrogatory No. 10 (**Apx. 708-709**).

[44]     Costello Affidavit (ECF 1-5) (**Apx. 127-131**).  *See Yates*, 2023 Westlaw 5108803, *4, 9-10 (discussing Shellpoint's assertions related to removal jurisdiction and Shellpoint's data analysis capabilities).

[45]     Dep. of McCullough (35:24 to 36:20)(**Apx. 806**).

[46]     *Yates*, 2023 Westlaw 5108803 at *1.

[47]     Plaintiffs' **summary herein in BOLD** is of all those facts presented in Defendants Memorandum of Law in Support of the Motion (ECF. 60-1 at ECF Pages 9-13 of 36).  The numbering is added by Plaintiffs to specify that which they respond.

loan.

PLAINTIFFS' DMF RESPONSE 1.1:  DISPUTED AND NON-MATERIAL FACTS. The allegation of facts relating to Plaintiffs' prior loan that Defendants never owned or serviced is not material to this action or the Defendants' motion.  Facts of default or foreclosure are also irrelevant to the claims before the Court.   Further, the Note and Deed of Trust for the Parker Loan serviced or owned by the Defendants expressly bar the junk fees at issue in this action. **Apx. 686** at ¶ 14.

**DEFENDANTS 1.2: Nationstar Mortgage LLC d/b/a Mr. Cooper identified the Plaintiffs in some of its records as in loss mitigation before the service transfer.**

PLAINTIFFS' DMF RESPONSE 1.2:  DISPUTED**.** Plaintiffs dispute this fact based on the Plaintiffs' Statement of Material Facts ("SOMF") *supra*.  *See* **MF. VII** and **MF VIII**. Nationstar admitted under oath in this action that the Plaintiffs never applied or sought loss mitigation. **Apx. 203**.  There is no exception to COM. LAW §12-121 for junk fees for inspections related to loss mitigation.

**DEFENDANTS 1.3: When Shellpoint became the servicer of the Parker Loan Plaintiffs owed 20 months of late fees.**

PLAINTIFFS' DMF RESPONSE 1.3:  DISPUTED. Plaintiffs dispute this assertion because the statement sent to them did not reflect late charges in that amount. The $952.60 consists of an "Overdue Payment" of $847.60 and the $105 fee for a visual inspection of their property. *See* **MF I., II., i-j**.  *See also* "Explanation of Amount Due" from Shellpoint Statements to the Parkers:

| Explanation of Amount Due | |
|---|---|
| Principal | $154.79 |
| Interest | $797.72 |
| Escrow (Taxes and Insurance) | $484.60 |
| **Regular Monthly Payment** | **$1,437.11** |
| Total Fees and Charges | $105.00 |
| Overdue Payment | $847.60 |
| **Total Amount Due** | **$2,389.71** |

**Apx. 191** (11/13/2019 Shellpoint Statement)

| Explanation of Amount Due | |
|---|---|
| Principal | $155.43 |
| Interest | $797.08 |
| Escrow (Taxes and Insurance) | $497.86 |
| **Regular Monthly Payment** | **$1,450.37** |
| Total Fees and Charges | $0.00 |
| Overdue Payment | $952.60 |
| **Total Amount Due** | **$2,402.97** |

**Apx. 194** (12/12/2019 Shellpoint Statement)

| Explanation of Amount Due | |
|---|---|
| Principal | $162.71 |
| Interest | $789.80 |
| Escrow (Taxes and Insurance) | $518.14 |
| **Regular Monthly Payment** | **$1,470.65** |
| Total Fees and Charges | $0.00 |
| Overdue Payment | $952.60 |
| **Total Amount Due** | **$2,423.25** |

**Apx. 786** (11/18/2020 Shellpoint Statement)

10

**DEFENDANTS 1.4:  Shellpoint was required, based on Mr. Cooper's statements, to complete the loss mitigation process and could not comment on Shellpoint's policies and practices.**

PLAINTIFFS' DMF RESPONSE 1.4:  DISPUTED AND NONRELEVANT. Plaintiffs incorporate their response to DMF 1.1 *supra*.  The loan was current. *See* **MF. VII** and **MF VIII**. Nationstar testified in this action that the Plaintiffs never applied or sought loss mitigation.  **Apx. 203**.  There is no exception to §12-121 for junk fees for inspections related to loss mitigation.

**DEFENDANTS 1.5:  When Shellpoint became the servicer, some of Mr. Cooper's documents indicated Plaintiffs were in loss mitigation.**

PLAINTIFFS' DMF RESPONSE 1.5:  DISPUTED. Plaintiffs incorporate their response to DMF 1.1 & 1.4 *supra*.  The loan was current. *See* **MF. VII** and **MF VIII**. Nationstar admitted under oath in this action that the Plaintiffs never applied or sought loss mitigation.  **Apx. 203**. There is no exception to §12-121 for junk fees for inspections related to loss mitigation.

**DEFENDANTS 2: Because the Parker Loan was in loss mitigation, a property valuation was required.  DEFENDANTS 2.1: Industry standards and Shellpoint's consistent policy and practice requires a property valuation when a borrower's loan is evaluated for loss mitigation.**

PLAINTIFFS' DMF RESPONSE 2.1:  DISPUTED. The status of the Parker Loan was current. *See* **MF. VII** and **MF VIII**. Also, the reference to the visual inspection conducted as a "BPO" does not change that it meets the statutory definition of an inspection fee.  *See* **MF. I a.-m** and **MF. V**.  Nationstar admitted under oath in this action that the Plaintiffs never applied or sought loss mitigation.  **Apx. 203**. There is no exception to §12-121 for junk fees for inspections related to loss mitigation.

**DEFENDANTS 2.2:  A licensed realtor performed the BPO related to the Parker Property.**

PLAINTIFFS' DMF RESPONSE 2.2:  DISPUTED AND NON-MATERIAL FACTS. The reference to the visual inspection conducted as a BPO does not change that it meets the

statutory definition of an inspection fee.  *See* **MF. I a.-m**. Mr. Johnson's licensing status is not

material since a real estate broker is not an appraiser. **MF I. f-m**.  The fact that Shellpoint engaged

a non-appraiser to perform the visual inspection of the Parker's real property is not an exempt

activity. This fact is not relevant except to show Shellpoint violated Com. Law § 14-202(8).

>    **DEFENDANTS 3:    Plaintiffs never were charged or paid for the BPO.**
> **DEFENDANTS 3.1:  As of October 23, 2019 Plaintiffs owed $952 in late fees which increased**
> **over time.**

>    PLAINTIFFS' DMF RESPONSE 3.1:  DISPUTED AND NON-MATERIAL  FACTS.

Plaintiffs dispute this assertion because the statement sent to them did not reflect late charges in

that amount. Discovery shows the $952.60 consisted of late charges of $847.60 and the $105 in

fee for a visual inspection of their property. The $952.60 amount appeared on subsequent

statements for over a year. *See* **MF I., II., i-j**. Plaintiffs incorporate by this reference DMF 1.3

*supra*.  In any event the late fee claim is not relevant or material to the claims before the Court.

>    **DEFENDANTS 3.2:  The added BPO fee was reversed and the Truth in Lending Act**
> **required the added charge for the BPO to be included on the Parkers' statement.**

>    PLAINTIFFS' DMF RESPONSE 3.2:  DISPUTED. The Defendants own assertions state

that there was a "charge" of $105 on the statement sent to the Plaintiffs. It was also added to the

$847.60 for overdue payment. The $952.60 amount appeared on subsequent statements for over a

year. *See* **MF. II. a, g-j**.    Plaintiffs incorporate by this reference DMF 1.3 and 3.1 *supra*.  TILA

and OCFR requires the statements to be accurate.  15 U.S.C.A. § 1638(f); 12 C.F.R. § 1026.41;

**Apx. 87** (48:12-17).

>    **DEFENDANTS 3.3: Plaintiffs never paid the fee related to the BPO and  Shellpoint**
> **never imposed the fee on the Parker Loan.**

>    PLAINTIFFS' DMF  RESPONSE  3.3:  DISPUTED  AND  NON-MATERIAL    The

Defendants' own assertions state that there was a "charge" of $105 on the statement sent to the

Plaintiffs. It was also added to the $847.60 for overdue payment. The $952.60 amount appeared on subsequent statements for over a year. *See* **MF. II. a, g-j**. Plaintiffs incorporate by this reference DMF 1.3 and 3.1 *supra.* The focus on payment is not material or relevant since Plaintiffs' claims under §12-121 prohibits the "imposition" of usurious charges. Defendants admit the charge was imposed. *See* Defendants 3.2 ("A BPO charge was added to the loan…").

**DEFENDANTS 4:   Shellpoint only stopped imposing inspections fees after the conclusion of the OCFR's examination.   DEFENDANTS 4.1:   The OCFR examined Shellpoint over the course of three years and at the end of the exam entered into an agreement which required Shellpoint to stop imposing some inspection fees.   It took Shellpoint some time to correct its automated systems but did so.   After that automated proceed concluded, the Parker Loan transferred to Shellpoint.**

PLAINTIFFS' DMF RESPONSE 4.1:   DISPUTED.   The Defendants' own assertions state that there was a "charge" of $105 on the statement sent to the Plaintiffs after January 1, 2019. It was added to the $847.60 for overdue payment. The $952.60 amount appeared on subsequent statements for over a year. See **MF. II. a, g-j**. Plaintiffs incorporate by this reference DMF 1.3 and 3.1 *supra.*   Further, the Defendants identified 35,838 inspection fees assessed between from January 1, 2019 to December 10, 2020. *See* **MF. X. a-c**. These numbers did not include the visual inspections that the Defendants have labeled "BPO". **MF. X. d**. In short, the Defendants' assertions that the visual inspections they label "BPO" are not inspection fees under Maryland law cannot be reconciled with the statutory definition and undisputed, material facts identified through discovery. Defendants' claims now are simply self-serving, sham statements not relevant or materials.

**DEFENDANTS 4.2:   The OCFR did not examine Shellpoint's BPO practices and has not considered whether a BPO qualifies as a barred inspection fee.**

PLAINTIFFS' RESPONSE 4.2:   DISPUTED AND NON-MATERIAL.   Whether or not the OCFR mentioned BPOs or issued an opinion is not necessary for the enforcement of a statute enacted by the legislature. Moreover, if the OCFR's opinion on the statute matters, the OCFR

agrees with "Consumer Protection Division of the Office of the Attorney General that an inspection fee is "a fee imposed by a lender or a credit grantor to pay for a visual inspection of real property." *See* **MF I. e**. Further, the OCFR does not give legal advice to its licensees who are expected to know the law pursuant to the regulations governing their conduct in Maryland. **Apx. 78** (12:5-13, 28:5-29:4);  **227** at ¶ 11; **228** at ¶ 14; Shellpoint was also bound to the Nationstar Assurance with the Attorney General as an assignee of the Parker Loan. **Apx. 84**(36:15-37:7); 99 – 109 (and specifically ¶ 16 on **Apx. 103** which applies to Shellpoint as Nationstar's assignee of the Parker Loan).

## IV.   STANDARDS OF REVIEW

Summary judgment is only appropriate if the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). The movant bears the burden to show there are no genuine disputes of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A genuine dispute of material fact precludes summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"If the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).  *See also Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir. 2006); *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 661 (4th Cir. 2017).

## V.   ARGUMENT

### a.   Longstanding Law and Precedent Bars Shellpoint from Imposing Usurious Fees Upon any Maryland Mortgage Borrower but It Did So Anyway

This action, like *Yates*, concerns remedial, consumer protection claims under Maryland's long-standing usury statutes which have been interpreted consistently by the Maryland Supreme Court. *See e.g.. Kemp*, 258 A.3d 296; *Taylor v. Friedman*, 689 A.2d 59 (Md. 1997).[48] Specifically, the putative class claims are based on Shellpoint's admitted practice of imposing inspection fees in violation of § 12-121(b) which states: "a lender may not **impose** a lender's inspection fee in connection with a loan secured by residential real property" (emphasis added).[49]  The legislature defined an impermissible "inspection fee" as "a fee **imposed** by a lender **to pay for a visual inspection** of real property." § 12-121(a)(emphasis added). The law does not leave room for debate – if a lender charges a fee for "visual inspection" (§ 12-121(a)), it is illegal. § 12-121(b) and cannot be avoided by simply calling the fee something else any more than calling a dog's tail a leg.[50]

The Maryland Supreme Court held, based upon nearly identical claims as presented in this action that the property inspection fee bar in § 12-121(b) applies to mortgage assignees and servicers who impose them.  *Kemp*, 258 A.3d at 322.[51]  The *Kemp* Court also explained the long-standing history of Maryland's usury laws. *Id.* at 311–12 (FN omitted).  *See also Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 376 (4th Cir. 2022)(applying *Kemp* and *Chavis* to COM. LAW § 14-202(11) presented in this action).

---

[48]    These authorities are binding interpretations on this Court.  *Fidelity Union Tr. Co. v. Field*, 311 U.S. 169, 177 (1940); *Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643, 648 (4th Cir. 2004); *Holdren v. Legursky*, 16 F.3d 57, 62 (4th Cir. 1994).

[49]    The Court certified a class that Shellpoint imposed inspection fees upon in *Yates* and the Parkers' have moved to certify a class of Maryland residents not members of the *Yates* class.

[50]    Abe Lincoln explained this in a riddle: "How many legs does a dog have if you call a tail a leg?" The answer is "four," because "calling a tail a leg does not make it one."

[51]    The Parkers also claim under § 14-202(11) of the MCDCA in addition to the claims under COM. LAW § 14-202(8) in *Kemp*. See AC at ¶ 69 and *ad damnum* ¶¶ E-F.  The claims under § 14-202(11) are strict liability claims and there is no knowledge component.  *Chavis v. Blibaum & Assocs., P.A.*, 264 A.3d 1254, 1272, 1276 (2021), underline reconsideration denied (Sept. 28, 2021).

The usury statute provides relief for the Parkers and the putative Class members: "Any person who violates the usury provisions of this subtitle shall forfeit to the borrower the greater of: (i) Three times the amount of interest and charges collected in excess of the interest and charges authorized by this subtitle; or (ii) The sum of $500."  § 12-114(b)(1).  Because of the General Assembly's policy choice to bar the 'imposition' of property inspection fees in the Usury Code, i.e., § 12-121, the statute does not allow Shellpoint to escape the remedial protections for "imposing" fees by arguing that the fee was not ultimately paid by the borrower or refunded to them (if even true).

There is no dispute that Shellpoint "imposed" inspection fees on the Parkers.  **MF I, II**. First, any alleged subsequent reversal of the charge does not change the fact that Shellpoint imposed an illegal fee, which appears as part of the "amount due" from the borrower on a monthly statement sent to the Parkers.  **MF II. a-j**.[52]  Defendants' argument is simple "subterfuge" which cannot be sustained.  *Kemp*, 258 A.3d at 302.  The *Kemp* Court also expressly held the "various provisions of the Maryland Usury Law address fees or charges that may be imposed in connection with a loan." *Kemp*,  258 A.3d at 302.  Further, "[t]here is no support in the case law or legislative history for this odd interpretation of the statute [that the usury must be paid before an action accrues].  It is well-established that a cause of action under the usury statute…remains available if the loan is not fully paid." *Patton v. Wells Fargo Fin. Maryland, Inc.*, 85 A.3d 167, 180 (2014).

**b.  The Statutory Definition of "Inspection Fee" in COM. LAW § 12-121(a) Controls and No Label Given to it by Shellpoint has Any Weight; There is No Dispute**

---

[52]        *See also* Shellpoint Statement to the Parkers (11/13/2019)(**Apx. 191-193**). Periodic statements and other communications to borrowers are required to be accurate. Dep. of Charland (48:12-17)(**Apx. 87**).   There is no authority that allows Shellpoint to include a fee under "Explanation of Amount Owed" if  the fee is not actually assessed as owed by the borrower. *Id.*

**that the Inspection Fee Imposed by Shellpoint onto the Parkers' Mortgage was for a Visual Inspection of Their Property**

COM. LAW § 12-121(a) broadly defines the term "inspection fee" to mean "a fee imposed by a lender to pay for a visual inspection of real property." *Id.* The definition (and related prohibition) was enacted in 1986 in response to the Report of the Task Force on Real Property Closing Costs …Section 12-121 was enacted for the purpose of "'prohibiting imposition of a lender's inspection fee under certain circumstances.'" *Kemp*, 258 A.3d at 325. As originally introduced, in 1986, this provision "may well have been on inspection fees associated with a loan closing. But the General Assembly struck…language from the bill in the course of passage" which had "[t]he effect…to expand the" scope of the provision to more than simple origination issues. *Taylor,* 689 A.2d at 64. Put another way, "the amendment to the…proposed statute concerning inspection fees indicates that the General Assembly did not consider that the prohibition against inspection fees was limited to closing costs." *Id.* Notwithstanding these guideposts and precedents, Defendants argue its inspection fee imposed upon the Parkers does not qualify as an "inspection fee" because they call it something else. Def. Mem. at 1, 9-10.

Defendants' argument lacks merit from a basic, plain reading of § 12-121(a). The Court and the Parties are bound by the statutory definition of property inspection fee in § 12-121(a). "When a legislature does define statutory language, its definition usually is binding on courts, even if the definition varies from a term's ordinary meaning." § 47:7. Definition provisions, 2A Sutherland Statutory Construction § 47:7 (7th ed.). Put another way, "[w]hen a statute specifically defines a word for the purposes of the whole title, the word should have uniform application throughout." *Gambo v. Bank of Maryland*, 102 Md. App. 166, 184 (1994). The statutory definition can also differ or vary from a dictionary meaning of the term. *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776–77 (2018). No doubt, Shellpoint wishes the definition was different or it could

unilaterally avoid it by choosing labels that hide the fee is for a visual inspection but that wish should not be granted by this Court.  Efforts to avoid usury laws have long been rejected by Maryland courts.  *See e.g. Plitt v. Kaufman*, 53 A.2d 673, 675–76 (1947).

There is no dispute of material fact that the inspection fee imposed by Shellpoint onto the Parkers' mortgage account concerned, involved, is for a "visual inspection" of their real property. **MF. I. a-j**. Shellpoint's authorized designees admit these facts.  **MF I.a.**  Shellpoint's agents admit these facts. **MF I.g-i**.   Shellpoint's licensing agency admits these facts.  **MF. 1.e**.

The Supreme Court explains "[w]hen a statute includes an explicit definition, we must follow that definition,' even if varies from a term's ordinary meaning." *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)(cleaned up).  Here, Shellpoint is not entitled to judgment based upon trying to limit 'inspection fee' by applying a label it chooses for a fee.  The plain[53] and unambiguous definition in COM. LAW § 12-121(a) forecloses the entirety of the Defendants' arguments.  *Tanzin,* 592 U.S. at 47; *Somers*, 138 S. Ct. at 776–77; *Gambo,* 102 Md. App. at 184; 2A Sutherland Statutory Construction § 47:7.  The statutory definition controls. It cannot be circumvented by labels chosen by the party regulated by the law.  Shellpoint's label to avoid the statutory definition is irrelevant.

To the extent the Defendants seek judgment in their favor by implying the statutory definition does not control, the Motion should be DENIED.  Based upon the undisputed material facts before the Court, the inspection fee qualifies under the plain text of COM. LAW § 12-121(a).

### c.  The General Assembly Established Statutory Exemptions to the Inspection Fee Bar in COM. LAW § 12-121; It would be improper for this Court to Expand Upon those Exemptions to Include BPOs of Any Other Similar Fee Not Stated

The General Assembly established three exceptions to the inspection fee bar in COM. LAW § 12-121(b): inspection fees related to the "[c]onstruction of a new home", related to "[r]epairs,

---

[53]     *Taylor,* 689 A.2d at 64 (finding that COM. LAW § 12-121 is "plain" on its face).

alterations, or other work required by the lender" (§ 12-121(c)(1) and(2)); and fees related to an appraisal (§ 12-121(d)).[54]  Here, there is no dispute that the inspection fee at issue related to the Parkers did not meet any of these exemptions.  **MF I., j-k**.  There is no issue relating to new construction, no issue relating to repairs.  Shellpoint's witnesses, and every witness related to Shellpoint's BPO inspection of the Parkers' agreed a BPO is not an appraisal.  **MF I. k.,m.,n**. Every BPO involves a drive-by visual inspection.  Every BPO is performed for the Defendants' internal purposes.  No BPO can be lawfully labeled as an appraisal in Maryland.

Notwithstanding Shellpoint's own admissions that the Defendants' inspection fee at issue is not an appraisal (**MF I.,k**), the Defendants argue it is a 'valuation fee' and therefore not an 'inspection fee.' *E.g.,* Def. Mem. at 15.   This argument fails largely because the Defendants seek to rewrite the plain meaning of the term 'inspection fee.' *See* Argument § V(b) *supra.*  In addition, the argument also fails since the undisputed material facts all confirm the fee (and similar such fees) is imposed by the Defendants for a "visual inspection of real property" belonging to the Parkers and other residential real properties.  **MF. I**. Moreover, ServiceLink, who performed the BPO inspection, acknowledges that it is something that Shellpoint orders for its own purposes, and is not a valuation of market value.  **MF I m, n**.

Defendants also assert that a BPO cannot be an inspection fee because an inspection fee is for a visual inspection at "loan settlement or for property preservation purposes". Def. Mem. at 25. This argument is simply inconsistent with the broad reading in *Taylor*, 689 A.2d at 64 discussed *supra*.  It is also ironic that Defendants make this argument when Defendants' only justification

---

[54]       The term "appraisal" is specifically defined in the Maryland Code.  Bus. Occ. & Prof. § 16-101(b).  And that definition specifically excludes opinions provided by licensed real estate professionals under Title 17 of the Bus. Occ. & Prof. Art.  Appraisals also must also be performed by licensed appraisers. Bus. Occ. & Prof. § 16-301.  In this case there is no dispute that the visual inspection performed on behalf of the Defendants was not an appraisal.  **MF. I., k**.

for the "BPO" is that it needed to determine if it would enter a loan modification the Parkers never sought. *See* Def. Mem. at 4; **Apx. 203**.   Any inspection for a loan settlement is no different than an inspection for a loan modification, even if requested by the Parkers (which it was not), since both impact a lender's decision whether to go forward with the loan or loan modification.

The Maryland Supreme Court rejected similar efforts to add to the list of exemptions in *Taylor,* 689 A.2d at 63,  The Fourth Circuit also cautioned against a court adding to the list of exemptions created by the Legislative branch.  *Alexander,* 23 F.4th 370, 374 (4th Cir. 2022).  The U.S. Supreme Court also explained in *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616–17 (1980) that exemptions should not be implied.  *See also Hillman v. Maretta*, 569 U.S. 483, 496 (2013).

Quite simply, the Defendants' effort to limit the scope of the inspection fee bar in COM. LAW § 12-121(b) is unjustified and contrary to the plain statutory text.  The Defendants' view would create an exception to § 12-121 never intended by the Legislature.  And given that the exception would be created by the party whom the statute regulates, it would likely lead to the demise to the statute.  Therefore, notwithstanding the Defendants' importuning, there is no just or fair reason for this Court to adopt their request to add to the list of inspection fees imposed by them from the list already expressly adopted by the General Assembly in § 12-121.  *Taylor,* 689 A.2d at 63; *Andrus,* 446 U.S. at 616–17; *Hillman,* 569 U.S. at 496.  To achieve their object to establish an exemption to sanction their otherwise usurious conduct, the forum for the Defendants' argument is to ask for the General Assembly to change the law.  *Alexander,* 23 F.4th at 374.

To the extent the Defendants seek judgment in their favor by asking the Court to add to the list of exemptions in § 12-121, directly or indirectly, the Motion should be DENIED.

    **d.  The Plain Language of Maryland Law Controls the Question Before the Court About "Inspection Fees;" Shellpoint Admits it Imposes Multiple Different Inspection Fees onto the Accounts of the Maryland Borrowers Just Like It Did for the Parkers**

Shellpoint's corporate designees and agents all agree the fees imposed by the Defendants upon the account of the Parkers and the class members they seek to represent all involved an inspection fee imposed by the Defendants "to pay for a visual inspection of real property." Com. Law § 12-121(a). *See* **MF I. a-j**. Shellpoint uses several fees that qualify. **MF I. a**. As stated above, the plain language of § 12-121 controls this question. *See* Argument § V(a)-(c) *supra*.

To avoid the plain language, the Defendants chose other labels, such as "BPO" or "property valuation" or "property valuation fee," in an apparent effort to circumvent the statutory definition enacted by the General Assembly. *E.g.,* Def. Mem. at 12, 18, 22. Adding a label or name that evades mentioning a statutory term, however, is of no moment when the General Assembly has defined the term by statute. *See* Argument § V(b) *supra*. To suggest otherwise would be to mean the regulated entity could simply avoid the consequences of its usurious conduct by calling 'interest' something different like a 'convenience fee' and therefore evade laws that cap 'interest.' Maryland courts have long rejected that subterfuge. *Plitt v. Kaufman, supra*. Or, put another way while a "fee[] [may] not [be] explicitly enumerated, Congress certainly did not want debt collectors to skirt statutory prohibitions through linguistic sophistry." *Alexander*, 23 F.4th at 377.

In other contexts, courts have routinely rejected the 'linguistic sophistry' that the Defendants offer to avoid the "plain" language of § 12-121(a). *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)("…an employer's self-serving label of workers as independent contractors is not controlling…"); *Johnson v. Sootsman*, 79 F.4th 608, 618 (6th Cir. 2023)(self-serving labels do "not provide a valid basis to ignore evidence"). *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019)(courts look "to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply").

21

There is no dispute of material fact that Shellpoint, on behalf of Goldman and other owners of mortgages and in its own right, unlawfully imposed tens of thousands of inspections fees onto Maryland consumers.  ECF 1-5 at ¶ 8; **MF. X. a-d**.  That usurious conduct has a penalty for each violation.  COM. LAW § 12-114(b)(1).  The Defendants' 'linguistic sophistry' simply cannot overcome the "moral taint [of usury] wherever it exists and no subterfuge shall be permitted to conceal it from the eye of the law." *Brenner v. Plitt*, 34 A.2d 853, 857 (1943).  *See also Kemp*, 258 A.3d at 302.

In *Kemp*, the servicer and loan owner sought to avoid the consequences of their usurious conduct by utilizing 'linguistic sophistry' designed to narrowly construe the term 'lender' in the Usury Code.  The servicer argued the term only applied to the original lender and not any of its assignees.  The Maryland Supreme Court rejected the servicer's 'linguistic sophistry' which would have resulted in: (i) a implicit repeal of the common law (which is disfavored unless the statute is clear) that assignees stand in the shoes of the assignor and have no greater rights than the assignor; and (ii) would establish a "a gaping loophole" in the usury law.  *Kemp*, 258 A.3d at 313.

Here, there is no dispute of the material fact that the Defendants imposed an inspection fee onto the account of the Parkers without the right to do so.  **MF II., a**.  No matter what label they apply to the fee, it remains undisputed the fee was for a visual inspection of the Parkers' real property and other real properties.  **MF. I., a-k**.  The Court should DENY the Motion on the basis that no "linguistic sophistry" or similar "subterfuge" can authorize the Defendants' admitted usurious conduct.  *Alexander*, 23 F.4th at 377.  *Cf. Kemp*, 258 A.3d at 313.

### e.   COM. LAW § 12-121 is Not Limited to Inspection Fees Arising Only from Alleged Mortgage Defaults

As part of their desire to churn unlawful fees, Defendants next claim without any basis, inspection fees barred by § 12-121 are only those fees which related to a default or delinquency of

a mortgage.  Def. Mem. at 12.  Nowhere in the "plain" language of § 12-121 is there such a distinction.  Claiming a default or delinquency condition is required before an inspection fee becomes unlawful is simply a backwards attempt to add another exemption into the law that defines and prohibits 'inspection fees'.  *See* Argument § V(c) *supra*.  The Maryland Supreme Court stated no such distinction on the same statute before the Court here.  *Kemp*, 258 A.3d at 318.

While the standard, uniform deed of trust initially authorizes inspection or valuation fees if a Borrower defaults, the same paragraph explains further the Defendants "may not charge fees that are expressly prohibited by…Applicable Law." **Apx. 686**, Plaintiff's Deed of Trust at ¶ 14 . In turn, the term "Applicable Law" is specifically defined to "mean[] all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." **Apx. 678** at ¶ J.  So, not only is § 12-121 part of the Parkers' mortgage contract, so are *Taylor* and *Kemp*.

In *Kemp*, the same standard mortgage provisions existed and the Maryland Supreme Court held the assignee of the original lender "did not acquire any greater right to assess property inspection fees against a borrower…than [the original lender] itself had under the deed of trust, which limited the authorization to charge fees prohibited by State law."  *Kemp*, 258 A.3d at 310. Here, unless the inspection fee qualifies for one of the enumerated exemptions in the statute, the Defendants are expressly barred from imposing it by the "plain" text of § 12-121 (Argument § V((c)) but also the Deed of Trust (*Kemp*, 258 A.3d at 310).

There is no dispute of material fact that the Parkers were current on their mortgage when it transferred to Shellpoint from Nationstar Mortgage LLC. **MF. VII**.  Shellpoint represented to the Parkers that they were in loss mitigation and the inspection had been ordered because of that standard and unform practice. **Apx. 65**.  Yet, Nationstar admits the Parkers had not requested to

23

be considered for loss mitigation before the service transfer and there is no evidence that the Parkers made such a request to Shellpoint either. **MF. VIII**; **Apx. 203**. Instead, Shellpoint created a pretext to impose an inspection fee on the Parkers' account as part of the sums it claimed were due from them. **MF. II., a**. That is simple fee churning and is usury. Argument § V(a)-(b).

To the extent the Defendants seek judgment on their favor on the claim that the inspection fee bar in § 12-121(b) only applies when a loan is in default or delinquency status, based on the foregoing, the Motion should be DENIED.

### f. The Defendants and Their "Mortgage Industry" Standard Arguments Ignore Clear, Ambiguous Maryland Law Incorporated into Every Standard Mortgage Contract in Maryland

Just two states—Maryland and West Virginia—bar the imposition of inspection fees onto the accounts of mortgage borrowers. § 12-121; W.VA. Code Section 46A-2-115.[55] The fees appear to be permitted in all other 48 other states and the District of Columbia. This action, however, concerns Maryland law which is incorporated into the Parkers's mortgage agreement and controls. Argument § V(e). Notwithstanding that Maryland usury law controls the practices at issue in this action, Defendants seek summary judgment based upon the laws of other states and based upon so-called industry standards. Def. Mem. at I., B and C. [56] The "plain" policy choice of the Maryland General Assembly in COM. LAW § 12-121 controls the issues before the Court. Argument § V(a)-(c) and the laws of other states or industry standards are irrelevant. Even if the

---

[55]     *See also* **Apx. 9**. Oregon also did for a limited time during the beginning of the COVID-19 pandemic. *See e.g.* Oregon House Bill 4204 (enrolled)(during the 80th Oregon Legislative Assembly – 2020 Special Session).

[56]     Shellpoint's reliance on various Fannie Mae guidelines as standards is not material because it knows Fannie Mae's guidelines don't apply to the Parker Loan. Def. Mem. at 19. In a prior state case, that Shellpoint was a party, Fannie Mae testified nothing in its guides authorizes its servicer to violate Maryland law. Dep. of Fannie Mae Corp. Designee E. Ludwig (115:17 to 116:7)(1/22/21)(from the matter of *White v. NewRez LLC & Fannie Mae* in the Circuit Court for Anne Arundel County, Maryland (Case No. C-02-cv-001060).

Court wished to consider so-called "industry standards" argument, Shellpoint's predecessor testified in this case that it knows it cannot impose inspection fees like Shellpoint did to the Parkers. **MF. IV**. The OCFR advisories against the practice are owed some deference under Maryland law. **MV IV. A**; *Matter of Smart Energy Holdings, LLC*, --- A.3d ----, 2024 WL 719231, at *18 (Md. Feb. 22, 2024).

The undisputed material facts also show no Maryland agency related to the conduct at issue ever authorized the Defendants to impose visual inspection fees in the form which occurred with the Parkers' mortgage account. **MF. IV.a.** Further, the same Maryland agency that licenses Shellpoint to perform its mortgage business said it agrees with the Office of the Attorney General of Maryland that an inspection fee is "a fee imposed by a lender or a credit grantor to pay for a visual inspection of real property." **MF. I.e**. Shellpoint's own inquiry of the agency agrees a visual inspection typically includes determining whether a property is occupied or vacant (just as occurred with the Defendants' inspection of the Parker Property). *Id.*

The statutory definition in COM. LAW § 12-121(a) controls. Argument § V(b)-(c). Nowhere in § 12-121 did the General Assembly limit on fees excuse compliance based upon "industry standards." Yet, elsewhere in the Maryland Code it knew how to do so when it so intended. *Cf.* HEALTH-GEN. § 15-1102; CORPS. & ASS'NS § 5-6B-04; PUBLIC SAFETY § 3-511.1; REAL PROP. § 11-131. By intentionally omitting the so-called 'industry standards' the Defendants prefer, the Legislature decided that mortgage actors are not entitled to loopholes through unregulated industry standards. *Cf. Kemp*, 258 A.3d at 313.

Based upon the foregoing, the Court should deny Defendants' request for industry standards (or the laws of other states) to trump the "plain" statutory text selected by the Maryland General Assembly. Maryland law is incorporated into the Parker's standard contract not the laws

25

of other states or unspecified industry standards.  *See also* Argument § V(e).  On this basis the Motion should be DENIED.

### g.  The Defendants are not Entitled to Summary Judgment on the Parkers' Debt Collection Claims

The Defendants contention that the debt collection claims should be dismissed because they prevail on their usury claims should be denied. As set forth above, the Defendants' arguments run contrary to the plain words of the statute or seek this Court to add exceptions that do not exist. Argument § V(a)-(f).  The Defendants are not entitled to summary judgment on Plaintiffs' usury claims and they are not entitled to summary judgment on Plaintiffs' debt collection claims.

### h.  The Parkers' Actual Damage Claims Survive Based upon the Disputed Material Facts and the Pre-judgment Interest they Are Entitled to as a Matter of Maryland Law

The Defendants seek dismissal of the Parkers' debt collection claims on the basis that they allegedly waived the inspection fee after they imposed it on the Parkers' mortgage account.   That contention is in dispute.  Shellpoint's statement issued to the Parkers in November 2019 shows a $105 fee as due and payable under the "Explanation of Amount Owed." **MF II.a**; **Apx. 191-193**. It also shows an "overdue" amount owed in the sum of $847.60.  The latter figure came from Shellpoint's system of record, Servicing Director.   **MF II a.,h, i., j**.  Adding the two figures together, the total amount due in fees – i.e., charges above the monthly principal, interest, and escrow – was $952.60.   This figure remained as the extra-contractual charge on statements issued to the Parkers by Shellpoint for at least the next year. **MF II. h.,i., j**; **Apx. 191-196; 786**. Shellpoint's core argument is refuted by its written representations to the Parkers.

But even if Shellpoint subsequently reversed its usurious fees off the account of the Parkers, and others like them, in this case under the MCDCA and MCPA the purported refunds

did not provide the Plaintiffs and the putative class members with all the relief to which they were entitled—the greater of $500 or three times the amount of the fee. § 12-114(b).  Further, in situations where the monetary damages "become certain, definite, and liquidated by a specific date prior to judgment," Maryland law requires that interest at 6% be added to these amounts to compensate for the loss of use of these amounts. *Buxton v. Buston*, 363 Md. 634, 656 (2001). The purpose of requiring the payment of 6% interest "…is to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." *I. W. Berman Properties v. Porter Bros.*, 276 Md. 1, 24 (1975). *See also Harford Cnty. v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 95 (2007).

There is no dispute that the Defendants know with certainty the "definite and liquidated" amounts of the illegally imposed inspection fees, and the number of days these amounts were imposed and retained by the Defendants before the Defendants attempted to reverse and refund the amounts to the Plaintiffs and putative class members. They have also not paid the $500 civil penalty that the law makes mandatory.  By their own admissions, the Defendants only attempted to refund the principal amount of the illegally imposed inspection fees.

In addition to the unpaid pre-judgment interest and penalty, the Plaintiffs and the putative class are entitled to a judgment on liability setting forth the principal amount of the illegally collected fees. Also, the Plaintiffs and the putative class are entitled to the judgment that the inspection fees imposed, charged, and collected by Defendants are illegal under Maryland law because this judgment will preclude the Defendants from changing their minds and reinstating the illegal inspection fee charges in the future under the doctrine of collateral estoppel. *Shader v. Hampton Improvement Ass'n, Inc.*, 94 A.3d 224, 238 (App. Ct. Md. 2014).

Defendants' Motion makes clear that they do not believe that charging inspection fees in violation of Maryland law by utilizing a label different that the statutory term, like they did to the Parkers, is prohibited and subject to civil damages and penalties. This creates the real possibility that Defendants will later reinstate their fee-churning operation in the future.  Plaintiffs and the putative class are entitled to a judgment on liability because it provides preclusive effect and will bind the Defendants' conduct going forward to ensure full and continued compliance with Maryland law.

### i.   Shellpoint's Arguments Under the MCDCA and MCPA are Unavailing

In certifying the class in *Yates*, Judge Chuang addressed and flatly rejected the argument that Shellpoint repeats here regarding the Plaintiffs' claims under the MCDCA and MCPA. His reasoning is equally fatal to Shellpoint's attempt to have those claims dismissed here.

> [Plaintiffs'] MCDCA claim is primarily premised on section 14-202(8) which states that "[i]n collecting or ***attempting to collect*** [emphasis added here] an alleged debt a collector may not… [c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."…. Likewise, [Plaintiffs'] MCPA claim does not require proof of reliance because an MCPA violation can be established simply by showing a violation of the MCDCA.   *See* Md. Code Ann.,Com. Law § 13-303….

*Yates*, 2023 WL 5108803, at *10.

### j.   Because the Parkers' Individual Claims Survive and for the Reasons Stated in their Motion for Class Certification, Defendants' Effort to Stike the Class Allegations Should be Denied

Even if the Court were to consider granting the motion to strike the class allegations, the result is not to dismiss the case but instead to allow for substitution of a class member as the named party and ultimately class representative. The filing of this action tolled any statute of limitations. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). The Seventh Circuit has characterized substitution in a class action as   "routine". *See Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th

Cir 2006).   Judge Chuang applied that ruling in this district. *Hill v. B. Frank Joy, LLC*, 2016 WL 4194189, at *7 (D. Md. Aug. 9, 2016).   While not conceding the merit of any of the Defendants' arguments, a putative class member, Alice Mejia, has moved to intervene and join this action as an additional class representative.   The inspection fees imposed and collected from Ms. Mejia are not solely tied to BPOs and Shellpoint never waived all of those fees as required by its agreement with OCFR or repaid to Ms. Mejia any interest she was entitled.

### k.  The Court Should  Enter an Order that the Defendants Imposed an Illegal Inspection Fee to the Plaintiffs

The Defendants are not entitled to the relief they seek by summary judgment for the reasons set forth above.  However, the Court may still "enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case." FED. R. CIV. P. 56(g); *Fritz*, 452 F.3d at 323. There is no factual dispute that the Defendants imposed an inspection fee on the Plaintiffs' account. This is set forth on Shellpoint's written monthly statement to the parkers. **MF II., a**. There is also no dispute that the fee that was imposed was for a visual inspection of the Plaintiffs' real property. **MF I., a-k**. In short, despite the efforts to convince the Court through labels that what the Defendants imposed was something other than a fee for a visual inspection, the substance of the fee should not be ignored by the Court. Argument § V(a)-(f).

## VI.  CONCLUSION

The Defendants cannot change the fact that the substance of the fee imposed on the Plaintiffs was for a visual inspection of the property. The usury law cannot be avoided by the use of "linguistic sophistry" or "subterfuge" or through the use of labels different than the statutory term. The exceptions that Defendants ask the Court to add to the binding precedents and statutory texts run counter to Maryland jurisprudence. Further, as shown herein there is no dispute that the

Parkers, just like the borrower in *Yates*, were "charged…$105.00…in property inspection fees" on their monthly statements.  *Yates*, 2023 WL 5108803, at *1.  Therefore, the Defendants are not entitled to summary judgment.

 Nor are the Defendants entitled to an order striking the class allegations. This very same issue was ruled on in *Yates* and there is no material difference to conclude otherwise. If the Court is inclined to grant the Defendants' strike motion, leave should be given for substitution by the intervention of a new named plaintiff.

 Finally, based upon the undisputed facts before the Court that the Defendants imposed an inspection fee, as defined by statute, and this fact should be established for this action.

Respectfully submitted,

*/s/ Scott C. Borison*
Scott C. Borison
Federal Bar No. 22596
**BORISON FIRM LLC**
1400 S. Charles St.
Baltimore , MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

*/s/ Phillip R. Robinson*
Phillip R. Robinson
Federal Bar No. 27824
**CONSUMER LAW CENTER LLC**
10125 Colesville Road, Suite 378
Silver Spring, MD 20901
(301) 448-1304
phillip@marylandconsumer.com

*/s Thomas J. Minton*
Thomas J. Minton
Federal Bar No. 03370
**GOLDMAN & MINTON, P.C.**
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Ph (410) 783-7575
Fax (410) 783-1711
*tminton@charmcitylegal.com*

*Counsel for Plaintiffs and Putative Class Members*

**CERTIFICATE OF SERVICE**

This is to certify that on this 14th day of March 2024 the foregoing and referenced papers, was served via the Court's electronic filing CM/ECF system on all counsel and parties of record.  A courtesy copy of the same will be delivered to the Court within 48 business hours as well.

_/s/ Phillip R. Robinson_____
Phillip Robinson

### L.R. 105.3 REPRINTING OF STATUTES & OTHER AUTHORITIES CITED HEREIN

### 15 U.S.C.A. § 1638(f) Periodic statements for residential mortgage loans (FNs omitted)

(1) **In general**
The creditor, assignee, or servicer with respect to any residential mortgage loan shall transmit to the obligor, for each billing cycle, a statement setting forth each of the following items, to the extent applicable, in a conspicuous and prominent manner:

> (A) The amount of the principal obligation under the mortgage.
> (B) The current interest rate in effect for the loan.
> (C) The date on which the interest rate may next reset or adjust.
> (D) The amount of any prepayment fee to be charged, if any.
> (E) A description of any late payment fees.
> (F) A telephone number and electronic mail address that may be used by the obligor to obtain information regarding the mortgage.
> (G) The names, addresses, telephone numbers, and Internet addresses of counseling agencies or programs reasonably available to the consumer that have been certified or approved and made publicly available by the Secretary of Housing and Urban Development or a State housing finance authority (as defined in section 1441a-1 of Title 12).
> (H) Such other information as the Board may prescribe in regulations.

(2) **Development and use of standard form**
The Board shall develop and prescribe a standard form for the disclosure required under this subsection, taking into account that the statements required may be transmitted in writing or electronically.

(3) **Exception**
Paragraph (1) shall not apply to any fixed rate residential mortgage loan where the creditor, assignee, or servicer provides the obligor with a coupon book that provides the obligor with substantially the same information as required in paragraph (1).

## Com. Law § 12-114. Remedies.

(a) This section does not apply to a loan subject to § 12-114.1 of this subtitle.

(b)(1) Any person who violates the usury provisions of this subtitle shall forfeit to the borrower the greater of:
> (i) Three times the amount of interest and charges collected in excess of the interest and charges authorized by this subtitle; or
> (ii) The sum of $500.

(2) A claim or plea of usury is not valid if, within 30 days from the date the loan contract was executed, the lender:
> (i) Notifies the borrower and any other party to the loan contract that the loan was usurious; and
> (ii) Agrees to modify it by substituting for the usurious rate of interest a legal rate of interest not exceeding the stated rate of interest.

(c) Any person who violates the disclosure provisions of § 12-106(b) and (c) of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year or both.

(d) Even if a loan document is executed outside of the State, this section is applicable if the loan is made to a resident of Maryland and is secured by property located within the State.

## Com. Law § 12-121.  Inspection fees.

(a) In this section, the term "lender's inspection fee" means a fee imposed by a lender to pay for a visual inspection of real property.

(b) Except as provided in subsection (c) of this section, a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property.

(c) A lender's inspection fee may be charged if the inspection is needed to ascertain completion of:
> (1) Construction of a new home; or
> (2) Repairs, alterations, or other work required by the lender.

(d) This section does not apply to an appraisal of the value of real property by a lender or to fees imposed in connection with an appraisal.

## COM. LAW § 14-202.  Certain acts prohibited.

In collecting or attempting to collect an alleged debt a collector may not:

(1) Use or threaten force or violence;

(2) Threaten criminal prosecution, unless the transaction involved the violation of a criminal statute;

(3) Disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false;

(4) Except as permitted by statute, contact a person's employer with respect to a delinquent indebtedness before obtaining final judgment against the debtor;

(5) Except as permitted by statute, disclose or threaten to disclose to a person other than the debtor or his spouse or, if the debtor is a minor, his parent, information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information;

(6) Communicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor;

(7) Use obscene or grossly abusive language in communicating with the debtor or a person related to him;

(8) Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist;

(9) Use a communication which simulates legal or judicial process or gives the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when it is not;

(10) Engage in unlicensed debt collection activity in violation of the Maryland Collection Agency Licensing Act; or

(11) Engage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act.

**CORPS. & ASS'NS § 5-6B-04(a)**

(a)      (1) There is an implied warranty from the developer to the cooperative housing corporation on the roof, foundation, and other structural elements, ceilings, floors, walls, mechanical, electrical, and plumbing systems.

(2) The warranty shall provide that the developer is responsible for correcting defects in materials or workmanship, and that the building elements specified in this description are within acceptable industry standards in effect when the building or buildings were constructed.

(3) The warranty begins with the first transfer of a cooperative interest in   the cooperative housing corporation to an initial purchaser. The warranty        on a portion of the cooperative project not completed at the time of the        transfer begins with the completion of that building element or with its         availability for use by members, whichever occurs later. The warranty           extends for a period of 3 years from the commencement date of the    warranty.

(4) A suit for enforcement of the warranty on a portion of the cooperative  project shall be brought by the cooperative housing corporation or by a     member.

**HEALTH-GEN. § 15-1102**

(a) The Department shall ensure that care coordinators delivering services under the 1915(i) model or a mental health case management program receive training in the delivery of services under a high-fidelity wraparound model.

(b) The Department shall provide reimbursement for:
    (1) Wraparound services delivered by care coordinators under a high-fidelity wraparound model under the 1915(i) model or a mental health case management program that is commensurate with industry standards for the reimbursement of the delivery of wraparound services;
    (2) Intensive in-home services delivered by providers using family-centered treatment, functional family therapy, and other evidence-based practices under the 1915(i) model that is commensurate with industry standards for the reimbursement of the delivery of family-centered treatment, functional family therapy, and other evidence-based practices; and
    (3) At least one pilot program utilizing value-based purchasing for case management services.

**PUBLIC SAFETY § 3-511.1**

(a)      (1) The Department of General Services, in coordination with the Department of Information Technology, shall negotiate contracts, at the request of one or more

law enforcement agencies, with third parties for the acquisition or maintenance of body-worn cameras, equipment, or technology for law enforcement agencies.

(2) The contracts negotiated under paragraph (1) of this subsection may include contracts for any related equipment or technology determined to be necessary for the effective use of body-worn cameras.

(3) The Department of General Services shall notify all law enforcement agencies of the contracts that are being negotiated under paragraph (1) of this subsection by posting the contracts on eMaryland Marketplace Advantage.

(b) The contracts negotiated under subsection (a) of this section shall prioritize:
(1) equipment and technology that complies with the policies developed by the Maryland Police Training and Standards Commission under § 3-511 of this subtitle;
(2) equipment and technology that conform to industry standards and best practices;
(3) cybersecurity and data privacy;
(4) compatibility with different equipment and technology;
(5) capabilities to effectively view, edit, redact, and transfer data from body-worn cameras; and
(6) cost effectiveness.


## REAL PROP. § 11-131

(c) In addition to the implied warranties set forth in § 10-203 of this article there shall be an implied warranty on an individual unit from a developer to a unit owner. The warranty on an individual unit commences with the transfer of title to that unit and extends for a period of 1 year. The warranty shall provide:

(1) That the developer is responsible for correcting any defects in materials or workmanship in the construction of walls, ceilings, floors, and heating and air conditioning systems in the unit; and
(2) That the heating and any air conditioning systems have been installed in accordance with acceptable industry standards and:
(i) That the heating system is warranted to maintain a 70°F temperature inside with the outdoor temperature and winds at the design conditions established by the Energy Conservation Building Standards Act,[1] Title 7, Subtitle 4 of the Public Utilities Article, or those established by the political subdivision as provided in Title 7, Subtitle 4 of the Public Utilities Article; and
(ii) That the air conditioning system is warranted to maintain a 78°F temperature inside with the outdoor temperature at the design conditions established by Title 7, Subtitle 4 of the Public Utilities Article, or those

36

established by the political subdivision as provided in Title 7, Subtitle 4 of the Public Utilities Article.

(d)(1) In addition to the implied warranties set forth in § 10-203 of this article there shall be an implied warranty on common elements from a developer to the council of unit owners. The warranty shall apply to: the roof, foundation, external and supporting walls, mechanical, electrical, and plumbing systems, and other structural elements.

(2) The warranty shall provide that the developer is responsible for correcting any defect in materials or workmanship, and that the specified common elements are within acceptable industry standards in effect when the building was constructed.

(3)(i) The warranty on common elements commences with the first transfer of title to a unit owner.

(ii) The warranty of any common elements not completed at the first transfer of title to a unit owner shall commence with the completion of that element or with its availability for use by all unit owners, whichever occurs later.

(iii) The warranty extends for a period of 3 years from commencement under subparagraph (i) or (ii) of this paragraph or 2 years from the date on which the unit owners, other than the developer and its affiliates, first elect a controlling majority of the members of the board of directors for the council of unit owners, whichever occurs later.

(4) A suit for enforcement of the warranty on general common elements shall be brought only by the council of unit owners. A suit for enforcement of the warranty on limited common elements may be brought by the council of unit owners or any unit owner to whose use it is reserved.


## W. Va. Code Ann. § 46A-2-115

(a) Except for reasonable expenses, including costs and fees authorized by statute incurred in realizing on a security interest, the agreements that evidence a consumer credit sale or a consumer loan may not provide for charges as a result of default by the consumer other than those authorized by this chapter.

(b) With respect to this subsection:

(1) The phrase "consumer loan" shall mean a consumer loan secured by real property: (A) Originated by a bank or savings and loan association, or an affiliate, not solicited by an unaffiliated broker; (B) held by a federal home loan bank, the federal National Mortgage Association, the federal Home Loan Mortgage Corporation, the Government National Mortgage Association, the West Virginia Housing Development Fund; or (C) insured or guaranteed by the Farmers Home Administration, the Veterans Administration or the Department of Housing and Urban Development.

(2) Except as provided in subdivision (3) of this subsection, the agreements that evidence a consumer loan may permit the recovery of the following charges: (A) Costs of publication; (B) an appraisal fee; (C) all costs incidental to a title

examination including professional fees, expenses incident to travel and copies of real estate and tax records; (D) expenses incidental to notice made to lienholders and other parties and entities having an interest in the real property to be sold; (E) certified mailing costs; and (F) all fees and expenses incurred by a trustee incident to a pending trustee's sale of the real property securing the consumer loan.

(3) For purposes of the charges expressly authorized by this subsection, no charge may be assessed and collected from a consumer unless: (A) Each charge is reasonable in its amount; (B) each charge is actually incurred by or on behalf of the holder of the consumer loan; (C) each charge is actually incurred after the last day allowed for cure of the consumer's default pursuant to section one hundred six of this article and before the consumer reinstates the consumer loan or otherwise cures the default; (D) the holder of the consumer loan and the consumer have agreed to cancel any pending trustee's sale or other foreclosure on the real property securing the consumer loan; and (E) in the case of an appraisal fee, no appraisal fee has been charged to the consumer within the preceding six months.

(c) All payments made to a creditor in accordance with the terms of any consumer credit sale or consumer loan shall be credited upon receipt against payments due: *Provided,* That amounts received and applied during a cure period will not result in a duty to provide a new notice of right to cure: *Provided, however,* That partial amounts received during the period set forth in subdivision (3) subsection (b) of this section do not create an automatic duty to reinstate and may be returned by the creditor. Default charges shall be accounted for separately. Those recoverable charges set forth in said subsection arising during the period described therein may be added to principal.

(d) At least once every twelve months, the holder or servicer of each consumer loan secured by real property against which the creditor assesses any default charge, and: (1) Not serviced by the originating lender or its affiliate or their successors by merger; (2) not held by a federal home loan bank, the federal National Mortgage Association, the federal Home Loan Mortgage Corporation, the Government National Mortgage Association, the West Virginia Housing Development Fund; or (3) not insured or guaranteed by the Farmers Home Administration, the Veterans Administration, Department of Housing and Urban Development, shall transmit to the consumer an accounting of every default charge assessed within the previous twelve months, including the date, amount and nature of the cost.

This subsection does not apply to delinquency charges permitted under sections one hundred twelve and one hundred thirteen, article three of this chapter; credit line over-the-limit fees; deferral charges permitted under section one hundred fourteen of this article; collateral protection insurance permitted under section one hundred nine-a of this article; and advances to pay taxes.

(e) A provision in violation of this section is unenforceable. The amendments to this section by acts of the Legislature in the regular session of 2003 are a clarification of existing law and shall be retroactively applied to all agreements in effect on the date of passage of the amendments, except where controversies arising under those agreements are pending prior to the date of passage of the amendments.

(f) Nothing in this section limits the expenses incidental to a trustee's sale of real property that are recoverable pursuant to section seven, article one, chapter thirty-eight of this code.


## 12 C.F.R. § 1026.41(a)

(a) In general—

> (1) Scope. This section applies to a closed-end consumer credit transaction secured by a dwelling, unless an exemption in paragraph (e) of this section applies. A closed-end consumer credit transaction secured by a dwelling is referred to as a mortgage loan for purposes of this section.
>
> (2) Periodic statements. A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a periodic statement meeting the requirements of paragraphs (b), (c), and (d) of this section. If a mortgage loan has a billing cycle shorter than a period of 31 days (for example, a bi-weekly billing cycle), a periodic statement covering an entire month may be used. For the purposes of this section, servicer includes the creditor, assignee, or servicer, as applicable. A creditor or assignee that does not currently own the mortgage loan or the mortgage servicing rights is not subject to the requirement in this section to provide a periodic statement.

(b) Timing of the periodic statement. The periodic statement must be delivered or placed in the mail within a reasonably prompt time after the payment due date or the end of any courtesy period provided for the previous billing cycle.

(c) Form of the periodic statement. The servicer must make the disclosures required by this section clearly and conspicuously in writing, or electronically if the consumer agrees, and in a form that the consumer may keep. Sample forms for periodic statements are provided in appendix H–30. Proper use of these forms complies with the requirements of this paragraph (c) and the layout requirements in paragraph (d) of this section.

(d) Content and layout of the periodic statement. The periodic statement required by this section shall include:

> (1) Amount due. Grouped together in close proximity to each other and located at the top of the first page of the statement:
>> (i) The payment due date;
>> (ii) The amount of any late payment fee, and the date on which that fee will be imposed if payment has not been received; and
>> (iii) The amount due, shown more prominently than other disclosures on the page and, if the transaction has multiple payment options, the amount due under each of the payment options.
>
> (2) Explanation of amount due. The following items, grouped together in close proximity to each other and located on the first page of the statement:

(i) The monthly payment amount, including a breakdown showing how much, if any, will be applied to principal, interest, and escrow and, if a mortgage loan has multiple payment options, a breakdown of each of the payment options along with information on whether the principal balance will increase, decrease, or stay the same for each option listed;

(ii) The total sum of any fees or charges imposed since the last statement; and

(iii) Any payment amount past due.

(3) Past Payment Breakdown. The following items, grouped together in close proximity to each other and located on the first page of the statement:

(i) The total of all payments received since the last statement, including a breakdown showing the amount, if any, that was applied to principal, interest, escrow, fees and charges, and the amount, if any, sent to any suspense or unapplied funds account; and

(ii) The total of all payments received since the beginning of the current calendar year, including a breakdown of that total showing the amount, if any, that was applied to principal, interest, escrow, fees and charges, and the amount, if any, currently held in any suspense or unapplied funds account.

(4) Transaction activity. A list of all the transaction activity that occurred since the last statement. For purposes of this paragraph (d)(4), transaction activity means any activity that causes a credit or debit to the amount currently due. This list must include the date of the transaction, a brief description of the transaction, and the amount of the transaction for each activity on the list.

(5) Partial payment information. If a statement reflects a partial payment that was placed in a suspense or unapplied funds account, information explaining what must be done for the funds to be applied. The information must be on the front page of the statement or, alternatively, may be included on a separate page enclosed with the periodic statement or in a separate letter.

(6) Contact information. A toll-free telephone number and, if applicable, an electronic mailing address that may be used by the consumer to obtain information about the consumer's account, located on the front page of the statement.

(7) Account information. The following information:

(i) The amount of the outstanding principal balance;

(ii) The current interest rate in effect for the mortgage loan;

(iii) The date after which the interest rate may next change;

(iv) The existence of any prepayment penalty, as defined in § 1026.32(b)(6)(i), that may be charged;

(v) The Web site to access either the Bureau list or the HUD list of homeownership counselors and counseling organizations and the HUD toll-free telephone number to access contact information for homeownership counselors or counseling organizations; and

(8) Delinquency information. If the consumer is more than 45 days delinquent, the following items, grouped together in close proximity to each other and located on the first

40

page of the statement or, alternatively, on a separate page enclosed with the periodic statement or in a separate letter:

    (i) The length of the consumer's delinquency;

    (ii) A notification of possible risks, such as foreclosure, and expenses, that may be incurred if the delinquency is not cured;

    (iii) An account history showing, for the previous six months or the period since the last time the account was current, whichever is shorter, the amount remaining past due from each billing cycle or, if any such payment was fully paid, the date on which it was credited as fully paid;

    (iv) A notice indicating any loss mitigation program to which the consumer has agreed, if applicable;

    (v) A notice of whether the servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, if applicable;

    (vi) The total payment amount needed to bring the account current; and

    (vii) A reference to the homeownership counselor information disclosed pursuant to paragraph (d)(7)(v) of this section.

(e) Exemptions—

    (1) Reverse mortgages. Reverse mortgage transactions, as defined by § 1026.33(a), are exempt from the requirements of this section.

    (2) Timeshare plans. Transactions secured by consumers' interests in timeshare plans, as defined by 11 U.S.C. 101(53D), are exempt from the requirements of this section.

    (3) Coupon books. The requirements of paragraph (a) of this section do not apply to fixed-rate loans if the servicer:

        (i) Provides the consumer with a coupon book that includes on each coupon the information listed in paragraph (d)(1) of this section;

        (ii) Provides the consumer with a coupon book that includes anywhere in the coupon book:

        (A) The account information listed in paragraph (d)(7) of this section;

        (B) The contact information for the servicer, listed in paragraph (d)(6) of this section; and

        (C) Information on how the consumer can obtain the information listed in paragraph (e)(3)(iii) of this section;

        (iii) Makes available upon request to the consumer by telephone, in writing, in person, or electronically, if the consumer consents, the information listed in paragraph (d)(2) through (5) of this section; and

        (iv) Provides the consumer the information listed in paragraph (d)(8) of this section in writing, for any billing cycle during which the consumer is more than 45 days delinquent.

    (4) Small servicers—

        (i) Exemption. A creditor, assignee, or servicer is exempt from the requirements of this section for mortgage loans serviced by a small servicer.

        (ii) Small servicer defined. A small servicer is a servicer that:

41

(A) Services, together with any affiliates, 5,000 or fewer mortgage loans, for all of which the servicer (or an affiliate) is the creditor or assignee;
(B) Is a Housing Finance Agency, as defined in 24 CFR 266.5; or
(C) Is a nonprofit entity that services 5,000 or fewer mortgage loans, including any mortgage loans serviced on behalf of associated nonprofit entities, for all of which the servicer or an associated nonprofit entity is the creditor….

## L.R. 105.3

Unless otherwise ordered by the Court, memoranda in support of a motion or in opposition thereto and trial briefs shall not exceed thirty (30) pages, and reply memoranda shall not exceed fifteen (15) pages, inclusive of footnotes but exclusive of (a) affidavits and exhibits, (b) tables of contents and citations, and (c) addenda containing statutes, rules, regulations, and similar material.

## § 47:7. Definition provisions, 2A Sutherland Statutory Construction § 47:7 (7th ed.)(FNs referenced but omitted from reprinting).

Legislatures can define the words of a statute and prescribe rules for their interpretation. Statutory definitions may appear in a separate section, or in the body of other substantive sections, juxtaposed with the defined terms.[1] When a legislature does define statutory language, its definition usually is binding on courts, even if the definition varies from a term's ordinary meaning.[2] Statutory definitions establish a term's meaning in the act in which the definition appears, or, for general interpretative statutes, a definition extends to as much legislation as the general act designates.[3] Courts may not be bound by statutory definitions where they are arbitrary and result in unreasonable classifications, or if they are uncertain, or defeat a statute's major purpose,[4] or where some other contrary intent clearly appears.[5] Additionally, statutory definitions themselves may be unclear and subject to interpretation.[6] Where a legislature fails to provide a more comprehensive definition of a statutory term after a judicial decision, its inaction indicates acquiescence in the judicial definition.[7]

Courts accord great weight to statutory definitions because they presume such definitions accurately reflect legislative intent.[7.50] A statute itself furnishes the best evidence of its own meaning, and if an act's intent can be ascertained clearly from its own provisions, that intent prevails and courts do not resort to other aids for construction. A legislature, best knowing its own intent, which defines the meaning of a word, not only exercises its legislative power, but does so with the explicit goal to provide a correct understanding of its intention, and thus to facilitate the primary judicial inquiry of statutory interpretation.[7.70]

A statutory definition declaring what something "includes" is more susceptible to extension by construction than a definition declaring what a term "means." The word "includes" is usually a term of enlargement, and not of limitation, and conveys the conclusion that there

are other items includable, though not specifically enumerated.[8] Conversely, a definition which declares what a term "means" usually excludes any meaning not stated.[9]

Where a legislature does not define a statute's words, courts generally give the words their common and ordinary meaning, in accordance with legislative intent, and to prevent absurdity and advance justice.[10] A "common and ordinary" meaning may include another statutory definition from a similar context,[11] a dictionary definition,[12] or a common-law definition.[13] A statute is not unconstitutionally vague simply because its terms are not specifically defined.[14]